**The STATE of Ohio, Appellant,**

v.

**ALDRIDGE et al., Appellees.**

[Cite as *State v. Aldridge* (1997), 120 Ohio App.3d 122.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15785.

Decided March 14, 1997.

124

126

*George A. Katchmer,* Montgomery County Assistant Prosecuting Attorney, for appellant.

*Reinhart Law Office* and *Harry R. Reinhart; Timothy Young; Stuart Benis;* and *Milano & Milano* and *Jay Milano,* for appellees.

---

FREDERICK N. YOUNG, Presiding Judge.

In 1985, petitioners-appellees, M. Jenny Wilcox and Robert Dale Aldridge, were convicted of several counts of child sexual abuse and related offenses, and were each sentenced to life imprisonment. A full ten years later their convictions were vacated and a new trial was granted by the Montgomery County Court of Common Pleas in a civil proceeding brought pursuant to R.C. 2953.21. The state appeals from the court's determination.

## I

### A. The Investigation and Trial

In August 1984, the Huber Heights Police Department began investigating allegations of child molestation in the Glenburn Green apartment complex. The investigation arose out of a complaint lodged by Sheila Hess, a resident of the complex, who had heard that several neighborhood children had become sexually active with one another. Hess was especially alarmed because she believed that her six-year-old daughter, Modesta Lorenza, along with three other five-year-olds, two girls and one boy, had been forced to engage in sexual activities by two neighborhood boys. The boys were initially identified as Justin Chronopoulos, age seven, and Scott Barnette, age four.

Huber Heights Police Detective Jennifer Bazell was the primary investigator in the case. Det. Bazell interviewed children, parents, and neighbors in the area and recorded her observations in an ongoing police report. After reviewing the police report detailing another officer's investigation of Hess's complaint, Det. Bazell identified the victims in the case as Mary Ann Picklesimer, a five-year-old girl, Chris Rodriguez, a five-year-old boy, Darcel White, a five-year-old girl, and Modesta Lorenza. She also identified the suspects as Scott Barnette, Justin Chronopoulos, and Justin's brothers, eleven-year-old Jason and twelve-year-old John Chronopoulos. As Det. Bazell interviewed the alleged victims, five other neighborhood boys ranging in age from eleven to thirteen began to emerge as suspects. Bazell determined that "[b]asically what we had was the suspects were forcing through threats the younger children to have sexual acts with the older kids and also was [*sic* ] trying to force the younger kids to have sexual acts with

each other." The names of more alleged victims emerged as the investigation continued.

After Det. Bazell's initial investigation, which included interviews with all of the suspects and alleged victims, the case took an important turn. Det. Bazell reported receiving phone calls from parents of the children involved, informing her that their children were implicating adults in the alleged sexual encounters. The children were allegedly claiming that the adults were "having" the older boys have sex with the younger children and had threatened to kill the children if they told anyone. The parents reported that the children had used the names "Dale," "Jenny," "Jimmy," "Eric," "Aaron," and "Scar Face" in reference to the adults. The parents also told Det. Bazell that the children were saying that the adults were taking photographs and filming the children performing sex acts in several vacant apartments in the complex. An additional alleged victim, Tya Sheppard, age six, and an additional suspect, Tya's brother Ryan Sheppard, age twelve, were identified by the parents. Tya and Ryan also implicated adults when they were interviewed by Det. Bazell. Finally, Mary Anne Picklesimer's sister Valerie, age eight, gave Det. Bazell "definite information" regarding the photography by adults.

On the basis of the children's stories, Det. Bazell obtained a search warrant to look for child pornography in the Glenburn Green apartment where Jenny Wilcox and Dale Aldridge lived. The search revealed both developed and undeveloped rolls of cartridge film and movie film, but none contained child pornography. Additionally, according to Det. Bazell's Report, "[a]ll of the children involved in this that were alleged victims were examined either by physicians of their own choice or at Children's Medical Center." The parents also wrote out statements on behalf of their children detailing the alleged sexual abuse by the adults.

Det. Bazell concluded that Dale Aldridge and Jenny Wilcox were the leaders of a group of adults who had been repeatedly sexually molesting the children of Glenburn Green. The two were arrested and charged with gross sexual imposition and pandering obscenity involving a minor. Det. Bazell continued her investigation into the role of the other named adults and the neighborhood boys who were the initial suspects. While most of the boys denied any sexual conduct, two of them, Justin Chronopoulos and Nathan Ruhl, admitted to having performed some sexual acts with younger children, but denied being a part of the other alleged sexual abuse.

Because, according to Det. Bazell's report, "[t]he three Chronopoulos boys had been indicated as suspects throughout this entire incident by every one of the children," Det. Bazell contacted the boys' mother and requested that the boys be brought to the police department for questioning. When the boys arrived, Det. Bazell interviewed them separately. She spoke first to John, who, at twelve

years of age, was the oldest. According to her own report, Det. Bazell began her interview with John by telling him that she was authorized to detain him at the Juvenile Detention Center unless he gave her "some information that [she] requested." She then proceeded to tell John what the other children had said about adults directing, filming, and participating in sexual abuse at the apartment complex. She again told John that if he failed to "cooperate," he would be detained at Juvenile Detention Center. John began to identify several adults, including Dale Aldridge, as participants in sexual abuse. Det. Bazell reported the following:

"When I started going through the list of victims, Modesta, Mary Ann, Christopher, Darcel, etc., he changed his story to where he stated that he heard that all of these people were there. He then started denying any part of it.* * * He changed his mind and he stated that he really didn't know what happened over there, that he wasn't there, that he had just heard that certain people were there, that he wasn't sure what apartment it happened in, etc. I started explaining to John once again that if he didn't come clean with me and was honest, he was going to be detained at Juvenile Detention Center. I also advised him that it was a very serious situation that we had, that he was withholding information and that I needed it. John still continued to change his story around. Finally I advised him that I was going to have him detained at the Juvenile Detention Center and if at any point he changed his mind and wanted to cooperate with me then he should get in touch with me. At that time I had John Chronopoulos transported downtown to the Juvenile Detention Center where he was detained on charges of rape and where he would be held until they had a hearing."

Det. Bazell next threatened to detain Jason Chronopoulos as well if he did not give her the information that she was looking for. When Jason, like John, explained that he had heard about sexual abuse at one of the apartments but that he was not there, Det. Bazell told him that she would not "listen to him tell lies" and that she was "going to have him detained at the Juvenile Detention Center." Jason became upset and began to cry. Det. Bazell had Jason taken to a holding cell at the police department to await transfer to juvenile detention. After an uncertain period of time in the holding cell, Jason indicated to a police officer that he wished to talk to Det. Bazell before he was transported. Jason told Det. Bazell about two occasions during which several adults had forced Jason, his brothers, and other boys to engage in sexual activity with younger children. Det. Bazell reported that she believed that John and Jason had much more knowledge than they had offered. She released Jason to his mother, telling him that she wanted to speak with him again and that she "wanted more information next time."

Shortly thereafter prosecutors began interviewing the alleged victims in order to assemble a case against Wilcox and Aldridge for the grand jury. After interviewing all of the children, the prosecutors determined that Valerie Picklesimer, age eight, would make the best witness. Many of the other children, including Chris Rodriguez and Tya Sheppard, were considered to be too young or too timid about the events to testify. At that point, Det. Bazell's impression of the case had changed, and she had come to believe that "[b]asically what it appeared to be was that these children had been involved in several different incidents at different times where these children were forced to submit to sexual activity between one another and to submit to sexual activity from the adults and by different adults at different times."

Also, during the latest round of interviews, two additional adult males had been named, a white man named "Jim" and a black man named "Doc." Additionally, the parents of the alleged victims gave the name of Eric Vogann to Det. Bazell as a possible offender, because "a couple of the children had reacted strangely when they were around Mr. Vogann." The police brought Vogann and several other adult suspects in for questioning. Vogann and the others, Jimmy Payne and Brian Joyce (who was suspected of being "Scar Face" because of his bad complexion), all said that they had heard about sexual abuse by way of neighborhood rumors, but denied any firsthand knowledge or involvement in sexual abuse of children.

In September, the investigator for the prosecutor's office, Ralph Beutle, and the police held two meetings with the parents of both the alleged victims and the young suspects. Beutle told the parents that he wanted to have some of the older boys, who at the time were still suspects, testify against the adults. The parents agreed that all of the children should be treated as victims and that Beutle should attempt to get information from the older boys. Det. Bazell's report reads:

"Those interviews started on 9/24/84 and Mr. Butle [sic] was able to obtain information from John Chronopoulos, one of the older boys, and Jason Chronopoulos, also an older boy. After Jason and John had returned home from their interview with Mr. Butle [sic], a boy who is very close friends with John Chronopoulos by the name of Chris Barnette found out that John had admitted to what had happened so Chris decided to come forward and talk about what he knew. We had set up a meeting for the 26th of September with all the parents of all the victims and the older boy suspects parents. Everyone was at a meeting at the community room at the Bufort Apartments at 7:00 on the 26th. At this meeting it was discussed exactly what we were trying to obtain and basically some of the information we already had. It was at this point that I learned that

Chris Barnette had talked to his mother about what had happened. She came up to me at the meeting."

The next day, Det. Bazell interviewed Chris Barnette and the two older Chronopoulos brothers. All three of the boys spoke of three different occasions when Dale, who was allegedly armed with a knife, and other adults forced the children to have sexual relations with each other and with the adults.

On September 27, 1984, the grand jury indicted Jenny Wilcox on two counts of forcible rape of a child under thirteen years of age and three counts of gross sexual imposition of a child under thirteen years of age with specifications of threats to cause physical harm, and Dale Aldridge on two counts of forcible rape of a child under thirteen years of age and three counts of gross sexual imposition of a child under thirteen years of age with specifications of threats to cause physical injury with a knife. All of the counts named Valerie Picklesimer as the victim. On December 11, a second indictment charged Wilcox with three additional rape counts and two additional counts of gross sexual imposition, and Aldridge with four additional rape counts and five more counts of gross sexual imposition. These counts named John Chronopoulos, Angelina Rodriguez, and Chris Barnette as the victims.

The other adult suspects, including Jimmy Payne, were never charged with a crime. The cases of the other eleven young children who were alleged victims were not pursued because of their conflicting statements and their ages, and their statements were used for corroborating evidence only. All three of the Chronopoulos brothers, Valerie Picklesimer, Angelina Rodriguez, and Chris Barnette testified that Wilcox and Aldridge had sexually abused them. A jury found both Wilcox and Aldridge guilty on all counts, and they were sentenced to life imprisonment. Their convictions were affirmed by this court. *State v. Aldridge* (May 6, 1986), Montgomery App. No. 9203, unreported, 1986 WL 5431; *State v. Wilcox* (Feb. 19, 1987), Montgomery App. No. CA–9189, unreported, 1987 WL 6822.

## B. The Hearing

John, Jason, and Justin Chronopoulos recanted their testimony in 1992. The Chronopoulos boys, who are now in their early twenties, claim that they lied during the 1985 trial because they were coerced by and frightened of the police and prosecutors. They all signed identical affidavits disavowing their former testimony and proclaiming their belief in the innocence of Wilcox and Aldridge. The affidavits were, according to the testimony of Justin Chronopoulos, prepared by Martin Yant, an author and apparently a crusader devoted to the cause of freeing individuals who have been wrongly or unfairly convicted of sexual molestation. While the Chronopoulos boys signed the affidavits at Yant's urging,

they each testified at the hearing that they believe the contents of the affidavits to be true.

At the hearing, John Chronopoulos testified that none of the allegations of sexual abuse by the adults or sexual activity among the children was true. He also recalled being interrogated twice by Det. Bazell when he was twelve years old. He also recalled that when he insisted to Det. Bazell that he had no knowledge of the adults molesting children, she had him handcuffed and transported to the Juvenile Detention Center. He testified that he was taken in a police car, without his mother or his brothers, to the Center and booked on a rape charge. John also said that he spent that night, his first away from home, in the Center. He testified that he agreed to tell Det. Bazell that the stories were true because he was afraid that, otherwise, he would remain in the Juvenile Center. John further testified that his fear of returning to the Center motivated him to continue lying to Det. Bazell and to testify falsely at Aldridge and Wilcox's trial.

Jason Chronopoulos testified that Det. Bazell threatened to send him to the Juvenile Detention Center as well. He denied having been involved in any sexual activity with the other children or the adults of Glenburn Green, and stated that he, John Chronopoulos, and Chris Barnette conferred about their testimony prior to the trial. Jason also stated that he testified as he did in the 1985 trial out of fear that he would be sent to jail or punished in another way if he failed to cooperate. However, he could recall no intimidation or threats from the prosecutors in the original case. Finally, Justin Chronopoulos also testified that he had been coerced into lying on the stand during the original trial, although he could not recall specific threats. Like Jason, he claimed that the brothers had discussed their story before testifying in the 1985 trial.

Much of the brothers' testimony relating to the coercive interrogation techniques of Det. Bazell is easily corroborated by reference to the report that Det. Bazell prepared in 1985. However, the petitioners claimed that the state, in defiance of the duties imposed by the Montgomery County Criminal Court Management Plan and Crim.R. 16, withheld the report from the defense. Det. Bazell testified at the hearing that she filed the report with the Montgomery County Prosecutor's Office. The petitioners, however, allege that the state did not include the report in the "discovery packet" that it provided to the defense, but, rather, substituted an eight-page "sanitized" version of the report. The petitioners claimed that exculpatory evidence that was amputated from the long report in the preparation of the short report was critical to the defense of Wilcox and Aldridge. The petitioners alleged that in addition to a description of the circumstances under which the boys finally yielded to Bazell's demands for incriminating information, the state also failed to disclose, *inter alia*, the existence and results of medical examinations performed on the alleged victims,

John's inability to make a photo identification of Dale Aldridge, and inconsistent statements by the children.

The petitioners also called Dr. John Joseph Peterangelo to the stand. Dr. Peterangelo testified that he is Valerie Picklesimer's physician and that he examined her in 1984 regarding the alleged sexual abuse in this case. He testified that his examination revealed no evidence indicative of vaginal or anal penetration by adult males. He also testified that he was never contacted by the police, prosecutors, or the defense in the original trial.

The petitioners called several expert witnesses who testified regarding the reliability of the children's testimony in the original trial. Dr. Richard Ofshe, a social psychologist at the University of California at Berkeley, testified as an expert in coercive interrogation techniques. Dr. Ofshe testified that Det. Bazell's interrogation techniques, documented primarily in the long report, were coercive and likely to encourage false statements, especially from children. Dr. Melvin Guyer, a professor of psychiatry at the University of Michigan, also testified that Det. Bazell's investigation was improperly conducted and that the children's memories of molestation may have been "created" by the interviewers. Two other experts, Dr. Elizabeth Loftus and Dr. Richard Gardner, testified for the petitioners. Dr. Loftus, a specialist in the area of human memory, testified that she found a "massive amount of suggestion in this particular case." Dr. Gardner, a child psychiatrist and authority on group hysteria, testified that mass hysteria can spread easily in an apartment complex like Glenburn Green.

After the hearing and the filing of post-hearing memoranda, the trial court issued a decision vacating and setting aside the convictions on all counts. The court stated that the petitioners had alleged three independent grounds for postconviction relief. First, they asserted that Wilcox and Aldridge were denied effective assistance of counsel in contravention of the Sixth Amendment as it is incorporated into the Due Process Clause of the Fourteenth Amendment. Second, they claimed that the recantations of the three Chronopoulos boys revealed a further Sixth Amendment violation. Finally, the petitioners asserted that the prosecution committed a so-called *Brady* violation by failing to furnish the defendants with known exculpatory evidence.

In its findings of fact, the court found that the state failed to disclose exculpatory material to the defendants:

"[I]ncluding, but not limited to, medical examinations conducted of the alleged child victims with negative results, inability of the oldest Chronopoulos boy to identify Aldridge in a picture, inconsistent statements of Valerie Picklesimer, John Chronopoulos and Jason Chronopoulos, and threats made by Detective Bazell to John and Jason in the face of their denials of any sexual conduct happening."

The trial court also found that Tya Sheppard, who was named as a victim in the "long" report, had denied the molestation and that this fact was not disclosed to the defense. Likewise, the court found that inconsistent statements made by Valerie Picklesimer were not provided in discovery. Additionally, the court determined that the state had failed to disclose evidence involving medical examinations of the alleged victims. First, the court found that the state had received before trial Dr. Peterangelo's report on his examination of Valerie Picklesimer, but had not revealed it. The court found that the state similarly failed to disclose that all of the alleged victims had undergone physical examinations, and that none of the girls had shown signs of sexual activity or abuse.

Although the court found that the state failed to disclose, either prior to or during the trial, the long report to either Wilcox's or Aldridge's attorneys, it also determined that there was "insufficient evidence" regarding whether the failure to disclose the evidence was willful. The court determined that, nonetheless, the petitioners demonstrated by more than a preponderance of the evidence that *Brady* material was withheld prior to and throughout the trial. The court held that the state's failure to disclose critical information to the defense deprived Wilcox and Aldridge of their due process rights so that their convictions should be vacated.

The court held that the petitioners' ineffective assistance of counsel claim was without merit, reasoning that any defective assistance by the defense attorneys was the result of the state's miserly approach to discovery. Regarding the recantations of the Chronopoulos brothers, the court stated that the recantations alone would not justify setting aside the convictions. The court held, however, that the recantations in combination with the exculpatory testimony of two other alleged victims, Darcel White and Tya Sheppard, and the testimony of the attorneys regarding insufficient discovery, gave rise to a strong probability that the result of a new trial would be different. Accordingly the convictions were set aside.

## II

The state filed a timely appeal and brings seven assignments of error. We address them seriatim.

### A

### First Assignment of Error

"Appellees failed to meet their burden of proof by a preponderance of the evidence that the defense did not receive all discovery to which it was entitled."

■ The petitioners in this case claimed that postconviction relief was warranted on the grounds that the state violated their due process rights by failing to provide complete discovery. Under this assignment of error, the state argues that Wilcox and Aldridge failed to establish by a preponderance of the evidence that the defense did not receive the allegedly missing items of evidence. In support of its assertion, the state notes that only three of the four attorneys who represented Aldridge and Wilcox at trial were called to testify at the hearing. Dennis Fallang, their first appointed attorney, was not called to testify as to whether he ever received the unabridged report. The state argues that the failure to call Fallang was fatal to the petition for postconviction relief because Fallang signed for the state's discovery packet on a date after the unabridged report was generated. The state contends that the long report was produced on August 31, 1984, and that Fallang accepted discovery from the state on September 7, 1984. Thus, the state argues that, without Fallang's testimony, the defense could not prove by a preponderance of the evidence that it did not receive full discovery.

The petitioners respond to this argument by first asserting that they did not need to call Fallang to testify because they called Aldridge's trial attorneys, who testified that they never received the long report. The state refutes this argument by pointing out that the prosecutor must have failed to turn over evidence to the defense in order for there to be a valid *Brady* claim. The state contends that once the prosecutor has provided the defense with evidence, it is the duty of the defense attorney, not the prosecutor, to turn over the evidence to any succeeding defense attorneys. Thus, the state contends that the petitioners did not meet the demands of R.C. 2953.21, which authorizes petitions for postconviction relief. The statute provides:

"(A)(1) Any person who has been convicted of a criminal offense *** who claims that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence ***."

■ A postconviction hearing is a civil proceeding governed by the Rules of Civil Procedure. *State v. Nichols* (1984), 11 Ohio St.3d 40, 42–43, 11 OBR 188, 189–191, 463 N.E.2d 375, 377–378; *State v. Pless* (1993), 91 Ohio App.3d 197, 632 N.E.2d 524. In such a hearing, the petitioner bears the burden of proof. However, because postconviction hearings are civil in nature, the petitioner needs only to prove the claim by a preponderance of the evidence. See *State v. Milanovich* (1975), 42 Ohio St.2d 46, 71 O.O.2d 26, 325 N.E.2d 540; *State v. Brown* (Mar. 22, 1991), Tuscarawas App. No. 90AP090054, unreported, 1991 WL 42514.

 The denial of due process may be a sufficient basis for a petition for postconviction relief. See *State v. Walden* (1984), 19 Ohio App.3d 141, 19 OBR 230, 483 N.E.2d 859, paragraph four of the syllabus. In *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215, 218, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This rule also applies to impeachment evidence. *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

The state's argument that the failure of the petitioners to call Fallang to testify was fatal has some intuitive appeal to it. Fallang, who evidently was present and able to testify, was the only individual in a position to say authoritatively that the state failed to disclose the unabridged report. The subsequent defense attorneys, Lawrence Rab, Richard Dodge, and Thomas Hanna, simply had no direct knowledge of the contents of the state's discovery packet as it was turned over to Fallang. Even the wide latitude given to the trial judge in determining credibility cannot overcome an *absence* of testimony relating to the central question in a case. In the state's view, the court could have believed every word of the defense attorneys' testimony and still have had no evidence on which to base a finding of fact that the long report was not disclosed to Fallang.

Thus, the state insists that this assignment of error "is not simply a weight and sufficiency of the evidence argument, but rather an argument concerning a failure of evidence *** because evidence of the essential elements of Appellee's claim of lack of discovery [was] never presented." The difference between this case, in which the appellant asserts a complete failure of evidence, and a typical sufficiency of the evidence case, in which the appellant asserts that the evidence does not meet the relevant burden of proof, is clearly one of degree, not kind. Accordingly, regardless of the state's belief that its argument is somehow meaningfully different from a sufficiency argument, we believe that the appropriate standard of review is the standard we always use to address disputes on sufficiency of the evidence or manifest weight.[1]

---

1. Recently, we have recognized that, in criminal cases, there are subtle but significant differences between the claim that a judgment is not supported by sufficient evidence and the claim that a judgment is contrary to the manifest weight of the evidence. See *State v. Hufnagel* (Sept. 6, 1996), Montgomery App. No. 15563, unreported, 1996 WL 501470; *State v. Jones* (1996), 114 Ohio App.3d 306, 683 N.E.2d 87; *State v. Scribner* (Feb. 21, 1997),

■ When reviewing the evidence on appeal, we are precluded from substituting our own judgment for that of the trial court where the record contains competent and credible evidence supporting the findings of fact and conclusions of law rendered by a trial court judge. *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 638 N.E.2d 533; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. In the case at bar we find evidence in the record sufficient to support the trial court's judgment.

First, we believe that the trial court could have reasonably inferred from the testimony of the three trial attorneys in the case that the unabridged report was not included in the discovery packet. In order to demonstrate that crucial information was not received by the defense, the petitioners called the second and third of the three defense attorneys who represented petitioner Aldridge at various stages of their prosecution. Thomas Hanna testified that he was appointed to represent Aldridge after Aldridge's attorney, Richard Dodge, withdrew from the case. Dodge gave to Hanna copies of the motions already filed by Dodge and the discovery packet containing documents provided by the prosecution pursuant to Montgomery County's Court Management Plan. Hanna testified that the unabridged report was not included in the packet that he received from Dodge. He stated that the report that he did receive did not contain Det. Bazell's description of her improper interrogation of the Chronopoulos boys and other information that would have altered his trial strategy.

Richard Dodge testified that Judge Kessler, who presided over the original trial, appointed him to defend Dale Aldridge. He testified that he had no independent recollection of his role in the case, but acknowledged his signature on the receipt dated October 9, 1984, for the discovery packet provided by the prosecution. He also stated that whenever he withdrew from a case, his policy was to deliver the entire discovery packet to any subsequent lawyers in the case. Lawrence Rab, petitioner Wilcox's defense counsel, was called by the state and also testified that he never received the unabridged report. While their testimony does not eliminate the possibility that Fallang may have accidentally or surreptitiously removed the long report from the defense file, we cannot agree

---

Montgomery App. No. CA 15863, unreported, 1997 WL 71776. The principal distinction between the two arises from the United States Supreme Court's determination that a defendant's double jeopardy rights preclude a new criminal trial when the first conviction is reversed on a finding of insufficient evidence, but not on a finding that the judgment is contrary to the manifest weight of the evidence. See, *e.g., Smalis v. Pennsylvania* (1986), 476 U.S. 140, 106 S.Ct. 1745, 90 L.Ed.2d 116. Because the principal rationale supporting precise application of the two standards in the criminal context is ensuring the logical operation of the Double Jeopardy Clause, distinction between the two appears to be unnecessary in civil cases such as this.

with the state's position that the petitioners "only presented partial and fatally incomplete evidence of this claim." Rather, the petitioners offered sufficient evidence to present a *prima facie* case that the report was not disclosed to the defense.

In addition to the testimony of Hanna, Rab, and Dodge, the court may have relied on the actual dates of the events recorded in the unabridged report for more proof that Fallang did not receive that report, at least not when the state claims that it was disclosed. The state claims that the unabridged report was generated on August 31, 1984, and was included in the discovery packet provided to Fallang on September 7, 1984. However, as the petitioners point out, that report itself contains references to interviews conducted by Det. Bazell on September 7, 11, 13, and October 1, 1984. The state responds that Fallang remained attorney of record until October 3, 1984, and that Rab and Dodge took discovery from Fallang on October 9. The state argues that, therefore, Fallang's testimony as to discovery during the period that he was attorney of record was necessary for the petitioners to support their claim.

We disagree. As noted above, we believe that the testimony of the three attorneys created a reasonable inference that the unabridged report was not disclosed, and the fact that the discovery packet was signed for by Fallang before that report was even completed supports that inference. Once the petitioners established their prima facie case, the burden shifted to the state to rebut the presumption that complete discovery was not bad. The state failed to advance any substantive evidence that Fallang or any of the other attorneys received subsequent discovery of the long report or supplements thereto, other than the short report prepared on October 4, 1984. Accordingly, we find that the record contains competent and credible, if indirect, evidence supporting the trial court's determination that petitioners proved by a preponderance of the evidence that the state withheld discovery to which the defense was entitled. Accordingly, appellant's first assignment of error is overruled.

## B

### Second Assignment of Error

"The court erred in admitting and basing its decision upon irrelevant testimony and on facts not in evidence."

Under this assignment of error, the state claims that the trial court's decision to allow expert testimony relating to community hysteria and "created" memories was error because the evidence was irrelevant to the constitutional claim presented by the petition. The state asserts that R.C. 2953.21(A), which authorizes postconviction relief, applies only to constitutional violations. The state contends

that, thus, evidence of the influence of nonstate actors, such as the children's parents and neighbors, cannot form the basis of relief. The state next lodges a series of complaints concerning Judge Parrott's haste and arbitrariness throughout the trial. Although these allegations and this assignment of error do not form an entirely congruent relationship, we will address them briefly.

A trial court has broad discretion over the admission of evidence. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Accordingly, a trial judge's decision to entertain certain evidence or testimony may be reversed only upon the appellant's showing of an abuse of discretion. " 'The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.' " *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313, quoting *Spalding v. Spalding* (1959), 355 Mich. 382, 384–385, 94 N.W.2d 810, 811–812. In order to constitute an abuse of that choice, a ruling must be "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1, 3. While the trial court's rulings were certainly perfunctory at times, they failed to rise to the level of abuse of discretion.

With respect to the admission of expert testimony at the hearing, we believe that the evidence was relevant and appropriate. Relevant evidence is any evidence which has a tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without it. Evid.R. 401 and 402. More specifically, expert testimony is admissible if it will assist the trier of fact in understanding the evidence in the case or in resolving a question of fact. *State v. Boston* (1989), 46 Ohio St.3d 108, 118, 545 N.E.2d 1220, 1231. Of course, such testimony is admissible only where it is beyond the common knowledge of the finder of facts. *State v. Koss* (1990), 49 Ohio St.3d 213, 216, 551 N.E.2d 970, 973; see, also, *State v. Buell* (1986), 22 Ohio St.3d 124, 131, 22 OBR 203, 209, 489 N.E.2d 795, 803. To the extent that the state is contesting the use of expert testimony on the issues of interrogation techniques and coercive methods employed by police or prosecutors, the Supreme Court of Ohio has expressly held that a criminal defendant may introduce expert testimony on the issue of "interviewing protocols" in child sexual abuse cases. *State v. Gersin* (1996), 76 Ohio St.3d 491, 668 N.E.2d 486. We see no principled justification for excluding such helpful testimony from a hearing such as was held in this case.

Likewise, to the extent that the state objects to the expert testimony concerning community hysteria, we are able to identify independent relevant uses of the

testimony. First, as the petitioners assert, the expert testimony "formed the factual background of the constitutional claim that three of the original victims in this case presented perjured testimony at trial and have now recanted." The testimony of Dr. Gardner, for example, although obviously not directly corroborative of the Chronopoulos boys' testimony, certainly buttressed it by exposing the pressures and dynamics that can arise in a closed community in crisis. While *State v. Boston* bars the use of expert testimony intended to establish the veracity of specific child witnesses, Dr. Gardner's testimony involved the kind of "generalities" that are appropriate, even when presented by the prosecution in a criminal case. See *State v. Daniel* (1994), 97 Ohio App.3d 548, 647 N.E.2d 174, citing *State v. Buell*, 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795, paragraphs one and two of the syllabus.

Moreover, the petitioners introduced the expert testimony not merely to illuminate the conditions under which the children's accounts of abuse may have been cultivated, but mainly to demonstrate the enormity of their trial attorney's error in not exploiting the issue at trial. The testimony was perfectly appropriate for the purpose of advancing petitioners' ineffective assistance of counsel claim. The state's bluster about the absence of "state action" thus entirely misconceives the nature of the petitioners' claim. As Aldridge's postconviction relief petition stated:

"The defense of Petitioner's [*sic* ] desperately needed some type of expert testimony to refute the children's claims of abuse and explain how children can make, and believe, and testify about false allegations. Dr. Richard Gardner out of New Jersey or Dr. Melvin Guyer from Michigan are experts in the area of child psychology and the suggestibility of children. Their testimony would have. been invaluable because this case rose or fell on the testimony of the children. It is important to explain to the jury how children can be sure that something has happened to them when in reality it is not accurate."

Thus, the expert testimony at the hearing had the legitimate purposes of demonstrating that the trial attorneys overlooked crucial evidence, and providing some rationale for why the Chronopoulos brothers may have lied in the original trial and why they should be believed now. We can hardly say that the trial court abused its discretion by allowing the testimony.

In addition to the expert testimony, the state also objects to the trial judge's decision to limit its case to one day, and to deny a one-week continuance so that Chris Barnette could return from his army post in Bosnia to testify. The state contends that the court's "arbitrary" one-day limit for the state's case and its "unconscionable" denial of a continuance for Barnette's return undermined the state's ability to present its case and affected the outcome of the hearing. We disagree.

 Regarding the court's denial of a continuance for the purpose of producing Barnette as a witness, we note that the disposition of a motion for a continuance is a matter that lies within the trial court's sound discretion. *State v. Sowders* (1983), 4 Ohio St.3d 143, 144, 4 OBR 386, 387–388, 447 N.E.2d 118, 120; *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 42–43, 423 N.E.2d 1078, 1079–1080. Accordingly, we may not disturb a trial court's decision denying a motion for a continuance, absent an abuse of discretion. *State v. Grant* (1993), 67 Ohio St.3d 465, 479, 620 N.E.2d 50, 66–67. Of course, as noted above, an abuse of discretion is more than an error of law and judgment, but implies on the part of the trial judge an attitude that is unreasonable, arbitrary, or unconscionable. *Ruwe v. Springfield Twp. Bd. of Trustees* (1987), 29 Ohio St.3d 59, 61, 29 OBR 441, 443, 505 N.E.2d 957, 959.

 When reviewing a court's disposition of a motion for a continuance, we must weigh the pretrial prejudice to the defendant against the court's "right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *State v. Powell* (1990), 49 Ohio St.3d 255, 259, 552 N.E.2d 191, 196; *Niam Investigations, Inc. v. Gilbert* (1989), 64 Ohio App.3d 125, 128, 580 N.E.2d 840, 841. Objective factors which may be considered by the trial judge in deciding whether to grant a motion for a continuance include the length of the delay requested, whether other continuances have been allowed, any inconvenience to the litigants, the court and witnesses, whether the requested delay is legitimate rather than dilatory, purposeful or contrived, whether movant contributed to the circumstances underlying the request, and other relevant factors based on the unique aspects of each case. *State v. Unger* (1981), 67 Ohio St.2d 65, 67–68, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080.

The petitioners argue that in this case the state had ample opportunity during the year and a half leading up to the hearing to either arrange for Barnette to be present or to preserve his testimony through a deposition. They argue that, moreover, Barnette's testimony would have been of questionable assistance in resolving the issues requiring the hearing. We agree. In the proffer, the state asserted that Barnette would testify that he told the truth at the original trial, and that the Chronopoulos boys were sexually abused as well. Essentially, the state intended to call Barnette to repeat his testimony from the trial. While Barnette's sworn testimony from the trial may undermine the credibility of the Chronopoulos boys' recantation, his repetition of it, even with his assurance that he still believes it to be true, would have little or no independent probative value. Accordingly, we find that on this issue the balance should be struck in favor of respecting the trial court's dominion over its own docket.

The state has additional complaints about the trial court's time management in this case. It asserts that the court "curtly and arbitrarily limited the prosecution

case to one day." In support of this assertion, the state cites the following exchange:

"THE COURT: You tell me how long a lunch hour you want, State.

"MS. HOWLAND: Couple days.

"THE COURT: Not going to happen. Come sundown, we're done.

"MS. HOWLAND: 1:30, your Honor.

"THE COURT: Okay, You want a full hour? No problem. One hour."

■ The state fails to direct our attention to any actual ruling by the court limiting the state's case to one day, to point to any objection lodged to the court's decision to so limit the state's presentation of evidence, or to assert any allegations of actual prejudice arising from an abbreviated case. See App.R. 16(A)(7); *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 123, 512 N.E.2d 640, 642–643; Civ.R. 61. The state also asserts that the court's decision to set a six-week time limit for briefs and its entry of a decision only six days after the submission of the briefs manifest a "hasty" approach to this case. Haste, without more, does not constitute reversible error. Moreover, the time limits on the briefs were, of course, equally applied to both parties.

The state raises another argument based in part on Judge Parrott's apparent haste. The state alleges that the judge's haste led him to neglect the record and to decide the case on facts that were not in evidence. It offers as an example Judge Parrott's finding that "the Defense did not know of John Chronopoulos' failure to pick Aldridge from a photo spread before, during or after trial," arguing that the defendants came to know of John's failure to identify Aldridge in pretrial and trial proceedings. This argument mischaracterizes the court's decision. The court merely found that the petitioners were not provided with the unabridged report, which contained exculpatory material "including, but not limited to *** inability of the oldest Chronopoulos boy to identify Aldridge in a picture." The state points to no evidence to even suggest that this finding was erroneous. Moreover, the court clearly offered that fact as an example of the material that was excluded from the packet, and never cited it specifically as a basis for the *Brady* violation. We believe that, in light of the court's finding that other exculpatory evidence was withheld, the trial court's holding that *Brady* material was withheld from the defendants "prior to and throughout the trial of the defendants" did not necessarily, or even probably, relate to this finding of fact. We discuss this point more thoroughly under the state's third assignment of error.

■ Finally, the state refutes Judge Parrott's reliance on Darcel White's testimony as corroborative of the Chronopoulos boys' recantation. While we

agree that Darcel's testimony that she had no recollection of any abuse is "corroborative" in the weakest sense of the term, we believe that the state again misrepresents Judge Parrott's decision. Little more can be said of her testimony than that it was not inconsistent with the Chronopoulos boys' testimony that the abuse never actually occurred. However, Judge Parrott did not exaggerate the importance of Darcel White's testimony, but only included it in a long list of evidence that, viewed in its totality, buttressed the Chronopoulos brothers' current story. Judge Parrott stated:

"At hearing, however, not only did the court receive proofs of recantation of testimony by each of the Chronopoulos boys, but the testimony of Darcelle [sic ] White saying she has no recollection of sexual abuse or seeing others sexually abused, three defense attorneys testifying that they did not receive from the State of Ohio and were unaware of material facts in this cases, Tya Sheppard's testimony regarding the State's driving her by certain apartments four or five times and asking her each time 'if this as where the sexual abuse happened to her' in the face of her denial, and Lawrence J. Rab testifying that he was unaware of handwritten children victim statements and that none had been provided him by the Assisting Prosecuting Attorneys on the case. Based upon the recantation of the various important victim witnesses, coupled with the additional evidence adduced which confirms that the witnesses are now truthful, the Court finds that the witnesses are now truthful, and that there is a strong probability of a different result at trial."

Judge Parrott's reference to Darcel White's testimony in this litany of evidence was entirely appropriate, and certainly not an abuse of discretion.

Because we find no substantial merit in any of the state's arguments under this heading, the second assignment of error is overruled.

C

THIRD ASSIGNMENT OF ERROR

"A reviewing court will not order a new trial for failure to disclose evidence pursuant to *Brady v. Maryland* if such evidence was discovered prior to or during trial."

The state next argues that, even if the unabridged report and other exculpatory information were withheld from the defense, the defense became aware of the information during the trial, so that a new trial based on a *Brady* violation was inappropriate. In order to address this contention specifically, some preliminary comments on *Brady* are in order.

In *Brady v. Maryland,* the United States Supreme Court stated the following:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218.

Thus, in order to establish a violation, the petitioner must demonstrate three elements: first, the prosecution failed to disclose evidence upon request; second, that the evidence was favorable to the defense; and third, that the evidence was material. See *Moore v. Illinois* (1972), 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706. Both exculpatory and impeachment evidence may be the subject of a *Brady* violation, so long as the evidence is material. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. The Supreme Court of Ohio has explained materiality and the *Brady* standard as follows:

"In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus.

If, however, the evidence that was allegedly withheld is merely cumulative to evidence presented at trial, no violation occurs. See *State v. Eubank* (1987), 38 Ohio App.3d 141, 528 N.E.2d 1294. Judge Parrott found that the exculpatory material in the withheld report included (1) medical examinations of the alleged victims that yielded negative results, (2) John Chronopoulos's failure to identify a photograph of Aldridge, (3) inconsistent statements obtained from Valerie Picklesimer and the elder two Chronopoulos brothers, and (4) Det. Bazell's use of coercive tactics in interviewing the Chronopoulos brothers. The court also found that the state withheld Tya Sheppard's denial that she was sexually abused or was present during the sexual abuse of others.

The state asserts that any exculpatory information contained in the unabridged report emerged prior to or during trial and, thus, did not constitute *Brady* material under *State v. Wickline* (1990), 50 Ohio St.3d 114, 116, 552 N.E.2d 913, 917. In *Wickline,* the Supreme Court of Ohio considered whether the defendant's discovery during trial of undisclosed police records relating to the alleged crime could form the basis of a *Brady* claim. The court rejected the claim for three reasons. First, the court, citing *United States v. Agurs* (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, held that *Brady* does not apply where alleged exculpatory records are presented during the trial. Second, the court noted that, under Crim.R. 16(E)(3), other means less drastic than a new trial, such as a continuance or a court order prohibiting the prosecution from presenting the

evidence, were available to the defendant, but he had elected not to seek any of them at trial. Finally, the court observed that the disclosure of the documents prior to trial would not have affected the outcome of the trial, as the three-judge panel presiding over the trial did review the material before reaching its verdict.

The state assumes and some appellate courts have suggested that *Wickline* creates a bright-line rule that previously withheld exculpatory material discovered by the defense during trial may never from the basis of a *Brady* claim. See *e.g., State v. Brown* (1996), 112 Ohio App.3d 583, 679 N.E.2d 361. We note that the *Wickline* court also determined that other, less drastic remedies were presented by Crim.R. 16(E)(3), and that Wickline simply failed to avail himself of them. Additionally, the court acknowledged that the panel hearing Wickline's case did in fact consider the exculpatory evidence. Our reading of *Wickline* suggests that, although the court appeared to list three independent reasons for denying the *Brady* claim, the second two reasons were in actuality the rationale for the first. In other words, *Brady* applies only to material discovered after trial because the defendant, if he chooses to, can generally ensure that material discovered prior to or during trial will be entered into evidence and is, thus, not substantially prejudiced. See *State v. Brown* (Sept. 30, 1992), Montgomery App. No. 12949, unreported, 1992 WL 302445. In a case such as this, where other remedies were not readily available to the defendants, the evidence was undoubtedly material under *Johnston*, and the finder of fact did not actually weigh the exculpatory evidence in reaching a verdict, *Wickline's* foundation trembles.

 We need not determine the exact parameters of the *Wickline* rule in this case, however, because we find that material exculpatory evidence sufficient to establish petitioners' *Brady* claim was not revealed until the unabridged report changed hands, which the court found did not occur until years after the trial. The state argues that all of the facts contained in the court's third finding of fact came, in one way or another, to the defendants' attention prior to or during trial.[2] First, the state asserts that Dr. Peterangelo's examination of Valerie Picklesimer and another examination of Angelina Rodriguez were known to the defendants at trial. The state also claims, without any citation to the record of either the

---

2. The state's argument that its failure to disclose the report did not constitute withholding evidence because many of the facts in the report made themselves known or were easily unearthed during trial ignores the crucial fact that the unabridged report and medical forms are themselves evidence. The state's attempted distinction between form, the actual report, and substance, the facts therein contained, elevates an elementary metaphysical observation over practical application of the law. There are certainly cases where the exculpatory information and the withheld evidence are separable so that withholding the evidence does not meaningfully interfere with the defendant's rights. However, the report was itself evidence that, for example, Det. Bazell may have perjured herself by claiming that there were no medical reports, and that the state was aware of the possibility that its child witnesses were committing perjury.

hearing or the trial, that "[t]estimony was given concerning the fact that all of the children had been examined." Second, the state argues that John Chronopoulos's failure to identify Aldridge in a photo display was disclosed in the abridged report, and was revealed through John and Jason's testimony at trial and at the pretrial motion to suppress hearing. Third, the state insists, without citation to the voluminous record, that the inconsistencies of statements by Valerie Pickle-simer were argued by the defendants at trial. "More importantly," the state remarks, "[John Chronopoulos's] testimony was that he was not initially forth-coming with Det. Bazell and was afraid and only gave her a statement after he had been taken to juvenile court." The state points to John's statement at trial "Well, I was afraid, and then I wouldn't talk until she took me to Juvenile Court."

With respect to John Chronopoulos's statement at the original trial, we note that the police report reveals that John, a twelve-year-old at the time, was threatened and coached by Det. Bazell. He was told what the other children had said about adults sexually abusing the children of the apartment complex. He was repeatedly threatened that if he failed to "cooperate," he would be detained at Juvenile Detention Center. Only after the threats did John begin to talk and to identify several adults, including Dale Aldridge, as participants in sexual abuse. Det. Bazell reported that when John again began denying the abuse, she had him transported to the Juvenile Detention Center and held overnight on charges of rape. Jason was subjected to similar treatment.

The state's argument is that, under *Wickline* and Crim.R. 16, the defense was required to request a continuance or related remedy when John made his statement regarding "Juvenile Court." As the state points out, the *Brady* rule requires the state to disclose material facts, but not the exculpatory significance of those facts. See *State v. Parker* (1990), 53 Ohio St.3d 82, 558 N.E.2d 1164, paragraph one of the syllabus. We are unaware of any Ohio case following *Wickline* wherein a statement such as that made by John Chronopoulos was sufficient to defeat a *Brady* claim involving the withholding of such exculpatory information. We decline to hold that John's reference to "Juvenile Court" was comparable to disclosing the report itself and directly alerting the defense to the enormity of Det. Bazell's mishandling of the child interviews.

The state similarly challenges the court's finding that the state sup-pressed Tya Sheppard's denial of abuse, even after extensive pressure from the police, by its failure to disclose the unabridged report. In its brief, the state makes the remarkable statement that "Tya Sheppard's name along with the numerous names of other children had been given to Appellees in the eight page police summary [the abridged report]," and that "[t]he Appellees were thus aware of Ms. Sheppard, of her age and her involvement in these matters prior to and at trial." One can hardly imagine evidence more exculpatory than one alleged

victim's flat denial of the abuse, made directly to the police and in the face of pressure to conform to police expectations, in a case where the evidence of the alleged crimes consists solely of child testimony. Other Ohio appellate courts' consideration of whether the state satisfies its duty under *Brady* where an individual has made an exculpatory statement to the police but the state merely provides the name and address of the individual as a prospective witness without also disclosing the existence and substance of the statement has not yielded a clear rule. See *State v. Sowell* (1991), 73 Ohio App.3d 672, 598 N.E.2d 136; *State v. Spitler* (1991), 75 Ohio App.3d 341, 352, 599 N.E.2d 408, 415; *State v. Hughes* (Nov. 4, 1993) Cuyahoga App. No. 62884, unreported, 1993 WL 453699; *State v. Terrell* (Dec. 22, 1992), Franklin App. No. 92AP–604, unreported, 1992 WL 386034. We believe, however, that at least where the individual is a six-year-old child merely named in a police report among "numerous" other children, and is not called as a witness or named as a victim at trial, the defense cannot be said to have received anything approaching meaningful discovery of the child's exculpatory statement.

The state finally asserts that the Tya Sheppard's statements to the police are not cognizable under *Brady,* for two reasons. First, the state argues that Tya's statements to the police are inadmissible because she was, at the age of six, presumably incompetent to testify. We stated in *State v. Today's Bookstore, Inc.* (1993), 86 Ohio App.3d 810, 821, 621 N.E.2d 1283, 1291, that the admissibility of the evidence at issue is critical to a successful *Brady* claim, because "[t]o be able to alter the outcome of the proceeding, evidence must be admissible." However, even assuming that Tya would need to be found competent to testify in order for the police report's description of her interview to be admissible, we find no basis for further assuming that the court would not have found her competent. Moreover, the contents of the police report would be admissible under Evid.R. 803(8), so that the critical evidence regarding Tya's treatment would be admissible under the rule at least to the extent that it does not contain additional hearsay.

Second, the state argues that the evidence concerning Tya does not meet the materiality test. In our mind, Tya's denial taken with the evidence of the gross mishandling of other alleged child victims in a prosecution case that relied exclusively on the testimony of children "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," as the United States Supreme Court most recently articulated the *Brady* standard. *Kyles v. Whitley* (1995), 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506. Thus, these two items alone, the treatment of the Chronopoulos brothers and the evidence relating to Tya Sheppard, are sufficient to make out a *Brady* violation. Accordingly, we decline to address the substance of the state's attack

on several other facts in the unabridged report that it believes were known to the defense and are, accordingly, not covered by *Brady*.

We do note, however, that the court identified the exculpatory facts in its third finding of fact as merely examples of the type of material that was contained in the undisclosed report. That some of them may have been known to the defense through other sources does not by any means defeat their *Brady* claim. The success of a *Brady* claim turns not on an item-by-item analysis of the withheld evidence, but rather on whether the "likely net effect" of such evidence yields a "reasonable probability" of a different result. *Kyles*, 514 U.S. at 437, 115 S.Ct. at 1567, 131 L.Ed.2d at 507–508. Therefore, the state's emphasis on, for example, the issue of John Chronopoulos's failure to identify a photo of Aldridge is misplaced in light of the substantial congregation of other exculpatory evidence.[3] As stated above, we believe that the aggregated evidence of the police's handling of this case undermines the reliability of the verdict.

In light of the foregoing, the appellant's third assignment of error is overruled.

### D

### Fourth Assignment of Error

"Absent proof of knowledge by the state a petition for post conviction relief cannot be granted on the grounds of perjured testimony since there is no state action supporting a constitutional violation."

Under this assignment of error, the state argues that, although the Chronopoulos brothers have all recanted their testimony from the original trial, perjured testimony cannot form the basis for postconviction relief under R.C. 2953.21 unless the petitioners demonstrate that the state knew or should have known that the testimony was perjured. The state argues that absent a showing of state action, R.C. 2953.21(A)'s prerequisite of a constitutional violation cannot be satisfied. Rather, according to the state, if relief is available at all, it must be pursued as a motion for new trial under Crim.R. 33.

The petitioners respond that the perjured testimony raises a constitutional issue under *Brady*. They assert that the state knew or should have known that the testimony was perjured and that the state had an affirmative duty to notify

---

**3.** In addition to the coercive interrogation tactics used on the Chronopoulos boys, and the denial of abuse by Tya Sheppard, appellees point to several other exculpatory items that the state does not argue were available to the defense prior to or during trial. The appellees' list of examples includes the parents' role in first raising the suggestion that adults were involved, the statements of two of the older boys, Justin Chronopoulos and Nathan Ruhl, indicating that the sexual activity involved only children, not adults, and the substantial number of the original alleged victims who denied knowledge of or involvement in the alleged abuse. The state does not directly dispute any of these assertions in its reply brief.

the defense and to correct the testimony. The petitioners argue that the state should have been alerted to the perjury by the unabridged report in its possession. This report details the conditions under which the brothers finally "cooperated" with Det. Bazell, and revealed the fact that John and Jason Chronopoulos could not identify Aldridge from the photo spread provided by the police. The petitioners point out that, additionally, the report reveals that two meetings were held between the prosecutors, investigator Ralph Beutle, and the parents of the alleged victims. An agreement to consider all of the children involved, including those like John Chronopoulos who were originally classified as suspects, to be "victims" emerged from these meetings. Finally, the petitioners argue that, not only did the state knowingly suborn perjury, but that, in light of the prosecution's total reliance on child testimony, there is a "reasonable likelihood" that the false testimony affected the verdict.

As the state points out, Judge Parrott made no finding with respect to the state's knowledge of any perjury by the Chronopoulos brothers at the 1985 trial. Even assuming that the state is correct that recantation without a finding of knowledge by the state cannot form the basis for postconviction relief under R.C. 2953.21, we see no cause to reverse the court's vacation of the petitioners' convictions. This is so because Aldridge's and Wilcox's sentences were vacated not merely on the basis that the state knowingly suborned perjury from the boys, but primarily because the state unconstitutionally withheld exculpatory material from the defense. We have already affirmed Judge Parrott's finding of a *Brady* violation, and we can discern no need for a further showing of state action. The police coercion of the Chronopoulos boys was perhaps the most important of the withheld facts, and, as the court determined, provides a compelling reason to believe that the brothers are now telling the truth. Because the *Brady* claim and the recantation of the Chronopoulos brothers are so closely intertwined, we decline to require independent findings of state action relating to each.

The petitioners have never wanted for a constitutional claim. Throughout the proceedings they have raised separate claims grounded on prosecutorial misconduct, ineffective assistance of counsel, and, of course, *Brady*. They have prevailed on their *Brady* claim, and, in our discussion of the state's first assignment of error, we have affirmed the court's finding of state action in wrongfully failing to disclose the unabridged report. Accordingly, the fourth assignment of error is overruled.

E

Fifth Assignment of Error

"Issues that have been or could have been raised on direct appeal are *res judicata* and cannot then be raised in a petition for post conviction relief."

 Postconviction relief is a narrow remedy because *res judicata* serves to bar any claim that was or could have been raised in the trial court or on direct appeal. *State v. Steffen* (1994), 70 Ohio St.3d 399, 639 N.E.2d 67. To overcome the *res judicata* bar, the petitioner must produce new evidence that renders the judgment void or voidable, and show that he could not have appealed the claim based upon information contained in the original record. *State v. Moore* (1994), 99 Ohio App.3d 748, 651 N.E.2d 1319.

The unabridged report was rife with new evidence that the trial court found was not known to the defendants until several years after their trial. The state does not directly argue that petitioners' *Brady* claim is barred by *res judicata*, but rather that any argument based on the coercion of the Chronopoulos boys is barred because Det. Bazell's interrogation techniques should have been revealed by John Chronopoulos's testimony. This is essentially the same argument that the state advanced under its third assignment of error, in an effort to show that the police report's description of the incarceration of John Chronopoulos was not "material" under *Brady*. We reject this argument here for the same reasons that we rejected it above: The unabridged report revealed a coercive and reckless handling of child witnesses that simply could not be gleaned from John Chronopoulos's remarks at trial.

Moreover, as noted above, the unabridged report contained exculpatory material in addition to the coercive tactics applied to the Chronopoulos brothers. On their direct appeals, Aldridge and Wilcox were precluded from raising issues not supported by the record. *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500. Accordingly, a hearing pursuant to R.C. 2953.21(A) was an appropriate, and perhaps the only available, means of relief. The state's fifth assignment of error is also overruled.

## F

### Sixth Assignment of Error

"A witness's recantation or even complete claim that he has perjured himself does not of itself warrant a new trial."

Under this assignment of error, the state argues that "something more than a simple recantation is needed for the granting of a new trial." The state asserts that a new trial is especially inappropriate in a case such as this, where the recanters gave vague, contradictory, and incredible testimony at the hearing. In support of this assertion, the state points to several examples of wholly unbelievable testimony from all three of the brothers.

We have recently reaffirmed the proposition that recantations of former testimony are to be "looked at with the utmost suspicion." *State v. Isham* (Jan.

24, 1997), Montgomery App. No. 15976, unreported, 1997 WL 24794. We agree with the state that the Chronopoulos brothers' testimony at the hearing was characterized by inconsistencies, impossibilities, unnecessary equivocations, and seemingly deliberate misstatements of fact. Moreover, Judge Parrott also had difficulty accepting the credibility of the brothers, stating in his decision that "[a]s to the issue of recantation, in application of the law recited above, this Court cannot say that the recantations of the Chronopoulos boys, alone, would warrant setting aside the convictions of the Petitioners and granting them a new trial."

Unlike the state, we do not believe that the inconsistencies and apparent falsehoods in the boys' testimony necessarily indicate that their claim that Aldridge and Wilcox were innocent of the abuse is untrue. The real difficulty with the Chronopoulos boys' testimony is that the truth is impossible to obtain solely by reliance on their testimony. The flaws in their testimony may be a result of the passage of a decade since the original trial, their young ages at the time of the alleged abuse, overenthusiasm at the hearing, and possibly even guilt or shame emanating from their role as suspects in the early stages of the investigation, before the names of Aldridge, Wilcox, or any other adults arose. Judge Parrott recognized that the credibility problems in the brothers' testimony did not necessarily undermine their claim that the petitioners were wrongly convicted, and properly turned to other evidence to corroborate or dispute their general assertions. After determining that the boys' testimony alone was not sufficient to warrant a new trial, Judge Parrott stated:

"At hearing, however, not only did the Court receive proofs of recantation of testimony by each of the Chronopoulos boys, but the testimony of Darcelle [sic] White saying she has no recollection of sexual abuse or seeing others sexually abused, three defense attorneys testifying that they did not receive from the State of Ohio and were unaware of material facts in the cases, Tya Sheppard's testimony regarding the State's driving her by certain apartments four or five times and asking her each time 'if this was where the sexual abuse happened to her' in the face of her denial, and Lawrence J. Rab testifying that he was unaware of handwritten victim statements and that none had been provided him by the Assistant Prosecuting Attorneys on the case. Based upon the recantation of the various important victim witnesses, coupled with the additional evidence adduced which confirms that the witnesses are now telling the truth, the Court finds that the witnesses are now truthful, and that there is a strong probability of a different result at trial."

We find no error in the court's analysis or in its conclusion. The foregoing reveals that the court did base its decision on "something more than a simple recantation." The court granted the new trial on the basis of the aggregation of the recantations, a wealth of corroborating evidence, and the *Brady* violation.

Moreover, the court made a separate finding of a *Brady* violation, entitling the petitioners to postconviction relief. That finding alone is sufficient to support the granting of a new trial. See R.C. 2953.21(G). We find that the court did not base its order of a new trial solely on the recantation, that its order was proper, and that the state's sixth assignment of error is, accordingly, without merit.

G

Seventh Assignment of Error

"Victims' rights must be considered by utilizing the least drastic means available to remedy a constitutional violation under Section 2953.21(G) Ohio Revised Code."

In its final assignment of error, the state invokes Section 10a, Article I of the Ohio Constitution, which states:

"Victims of criminal offenses shall be afforded fairness, dignity and respect in the criminal justice process, and, as the general assembly shall define and provide by law, shall be accorded rights to reasonable and appropriate notice, information, access, and protection and to a meaningful role in the criminal justice process."

The state asserts that this section, the Victims' Rights Amendment, requires a "balancing of competing rights" in the criminal justice system. The state argues that the other three alleged victims from the original trial "have refused to recant their trial testimony." The state contends that the rights of Chris Barnette, Valerie Picklesimer, and Angelina Rodriguez were completely overlooked, in total disregard of Section 10a, when the court failed to adopt "the least drastic remedy" for the constitutional violations that may have occurred in this case. According to the state, the court erred in not considering the rights of the "nonrecanting victims" and that the appropriate, and least drastic, remedy would have been to "resentence Appellees as provided in Section 2953.21(G) for only those counts in the indictment that involve victims other than the Chronopoulos brothers."

The petitioners urge us to reject this assignment of error on several grounds. First, they argue that the state has waived any error based on the Victim's Rights Amendment by failing to raise it before the lower court. Second, they assert that the state's assertion that three of the alleged victims refused to recant their testimony has no basis in the record of these proceedings, and, as such, cannot be considered on appeal. Third, the petitioners assert that the Victim's Rights Amendment is inapplicable because, with the exception of the petitioners themselves, there simply are no victims in this case. Finally, the petitioners argue that, in light of the fact that three of the original six witnesses in a

prosecution that consisted strictly of witness testimony have recanted, no remedy short of the ordering of a new trial can be justified.

An enduring principle of appellate review is that a party waives an error that it fails to preserve through an objection at trial. See *State v. Bidinost* (1994), 71 Ohio St.3d 449, 644 N.E.2d 318. Equally enduring is the principle that a party may not argue matters that are not contained in the record. *State v. Ishmail*, 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500. However, the state responds that it properly preserved the issue of victims' rights by requesting that the court fashion a remedy that left standing the convictions based on the alleged abuse of the three nonrecanters. Regarding the absence from the record of evidence indicating that the other witnesses have "refused to recant," the state asserts that it proffered the testimony of Chris Barnette and sought a continuance so that he could testify at the hearing. Even if the state has properly preserved the issue, and has sufficiently established the record, we hold that the court did not err by failing to order a less drastic remedy than it did.

No right of the victim is advanced, and no interest of the state served, by incarcerating the innocent. The state laments that "[w]e afford convicted felons better rights" than were afforded to the nonrecanters. The state also makes the *ad hominem* and nonsensical assertion that "[c]ertainly citizens who have not admitted to or ever been accused of perjury should be afforded the same rights and deference as those who have." The suggestion that the Chronopoulos brothers have been afforded greater rights as citizens than Barnette, Picklesimer, and Rodriguez because the former are or were at one time perjurers is pure fantasy. The Supreme Court of Ohio has stated, in a case that the state itself points to, that "a trial before a judicial tribunal is primarily a truth-determining process, and if it in any sense loses its character as such, it becomes the veriest sort of a mockery." *State v. Marinski* (1942), 139 Ohio St. 559, 560, 23 O.O. 50, 51, 41 N.E.2d 387, 388. The ultimate aim of the criminal justice system, then, is not the balancing of rights, but the uncovering of truth. By recanting their testimony, the Chronopoulos brothers are not in some sense waiving their rights as victims, while the nonrecanters continue to assert theirs. Rather, they are casting doubt on the proceedings as a whole. See *Kyles*, 514 U.S. at 445, 115 S.Ct. at 1571, 131 L.Ed.2d at 513 ("the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others"). Moreover, the derelictions of the state in failing to disclose exculpatory material cast even graver doubt on the result. When a defendant raises serious concerns that he was, as a result of the state's misdeeds, falsely convicted of nefarious crimes, our constitutional duties are best exercised, and no one's rights are meaningfully diminished, by the ordering of a new trial.

The state's seventh assignment of error is overruled.

## III

In light of the foregoing, the judgment of the Montgomery County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROGAN, P.J., and WOLFF, J., concur.