OPINION
Defendant, Steven Golson, appeals from his conviction and sentence for aggravated robbery and kidnapping.
On the night of September 28, 1998, Defendant, David Coleman and Greg Caldwell met at Parkside Homes in Dayton, Ohio. After some discussion, the three men decided to commit a robbery to get some money. Defendant had a gun. The three men proceeded to North Main Street and Santa Clara, near the Upper Krust restaurant, looking for someone to rob.
At about 10:30 p.m. Herbert Hopkins drove up to the pay phone in front of the Upper Krust. He got out of his vehicle and made a phone call. While Hopkins was on the phone, Caldwell put on a mask, took Defendant's gun, and walked over to Hopkins' vehicle. After Hopkins had completed his phone call and started to get back into his vehicle, Caldwell pointed the gun at Hopkins and demanded his money. Hopkins gave Caldwell his cash and his pagers.
By this time Coleman and Defendant had joined Caldwell. Coleman ordered Hopkins to give him his jewelry, which Hopkins did. Caldwell then forced Hopkins at gunpoint to get into his vehicle, and the three took Hopkins away, with Defendant driving Hopkins' vehicle.
While they were in the car Caldwell proposed killing Hopkins. Defendant eventually stopped in an area near Germantown and Gettysburg. Coleman ordered Hopkins to remove his pants and shoes. The three then told Hopkins to get out of the car and run into the nearby woods. Instead, Hopkins ran toward Gettysburg, jumped a fence and laid on the ground. The perpetrators pulled up alongside Hopkins' location, and fired four shots before driving away. After waiting a few minutes, Hopkins ran to a nearby store and called police.
After the perpetrators divided Hopkins' money, they drove around looking for a car they could steal and sell to a chop shop. Around 11:30 p.m., they spotted a white Lincoln Navigator parked at a payphone on Salem Avenue, near Fairport. The driver, Pierce Foster, was sitting inside the vehicle using the phone. Caldwell, who was now driving Hopkins' stolen vehicle, pulled up and parked right next to the Navigator. Defendant then quickly jumped out, ran over to the Navigator, pointed the gun in Foster's face and ordered him out of the car. Caldwell told Foster to give them his money. Foster then threw his cash down on the ground. As the perpetrators were picking the money up, Foster quickly walked away.
Foster saw a person he knew, Annie Lovelace, and flagged her down. Foster told Lovelace what had just happened. As the three perpetrators began to drive away in Foster's Navigator, Lovelace followed them in her vehicle while Foster called police using her car phone. Foster and Lovelace followed the Navigator to an alley off of Ravenwood, near Salem Avenue. Dayton police arrived on the scene and the three perpetrators fled on foot toward Salem Avenue.
Coleman was quickly apprehended. Both victims, Hopkins and Foster, were brought to the scene, and they identified Coleman as one of the robbers. Hopkins' jewelry was found on Coleman's person. Later that morning Coleman talked with police. At first, Coleman said he and "Tony" committed the robberies. Later, Coleman admitted that there was no Tony, and he told police that Defendant and Caldwell were the other two participants in these robberies.
As a result of these events, Defendant was indicted on two counts of Aggravated Robbery, R.C. 2911.01(A)(1), and one count of Kidnapping, R.C. 2905.01(A)(2). A firearm specification was attached to all three counts. Both Coleman and Caldwell entered into plea agreements with the State and testified against Defendant at trial. As a defense to these charges Defendant presented an alibi. Following a jury trial Defendant was found guilty of all charges and specifications. Defendant was subsequently sentenced to consecutive terms of imprisonment totaling twenty-nine years.
From his conviction and sentence Defendant has now timely appealed to this court.
 FIRST ASSIGNMENT OF ERROR (WHETHER) DEFENDANT'S CONVICTION WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF SUFFICIENT EVIDENCE OR BEYOND REASONABLE DOUBT, PRIMARILY BECAUSE OF CONTRARY IDENTIFICATION EVIDENCE, AND THEREBY VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION.
In this assignment of error Defendant challenges both the weight and sufficiency of the evidence. We shall address each claim separately.
Defendant was found guilty of aggravated robbery, and kidnapping.
R.C. 2911.01(A)(1) provides:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.
R.C. 2905.01(A)(2) provides:
 (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
 (2) To facilitate the commission of any felony or flight thereafter.
In addition, the complicity statute, R.C. 2923.03, provides in relevant part:
 (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
* * *
(2) Aid or abet another in committing the offense.
* * *
 (F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.
A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, (1997), 78 Ohio St.3d 380. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991), 61 Ohio St.3d 259:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Reviewing all of the evidence presented in this case, particularly the testimony given by the victims, Hopkins and Foster, and Defendant's two accomplices, Coleman and Caldwell, we conclude that such evidence, if believed, would convince the average mind of Defendant's guilt beyond a reasonable doubt. Stated differently, viewing this evidence in a light most favorable to the State, a rational trier of fact could find the essential elements of aggravated robbery and kidnapping proven beyond a reasonable doubt. Jenks, supra. Defendant's convictions are supported by legally sufficient evidence.
Defendant also argues that his convictions are against the manifest weight of the evidence.
A weight of the evidence argument challenges the believability of the evidence, and asks which of the competing inferences suggested by the evidence is more believable or persuasive. State v. Hufnagle (Sept. 6, 1996), Montgomery App. No. 15563, unreported. The proper test to apply to that inquiry is the one set forth in State v. Martin (1983),20 Ohio App.3d 172, 175:
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way. State v. Bradley (October 2, 1997), Champaign App. No. 97-CA-03, unreported.
In arguing that his convictions are against the weight of the evidence, Defendant relies upon a number of factors that create conflicts in the evidence. For instance, Defendant denied participating in these robberies and testified at trial that he was at home at that time. However, there was no evidence that definitively corroborated Defendant's alibi claim. The State discredited Defendant's alibi witnesses, and further weakened the alibi claim by demonstrating that Defendant had lied about other matters. Even defense counsel downplayed the importance of the alibi in his closing arguments. Moreover, the testimony by Defendant's accomplices and victims place Defendant at the scene of these robberies.
Next, Defendant attacks the credibility of his two accomplices. Defendant first points out that Coleman did not initially tell police that Defendant was one of the robbers. Instead, Coleman identified "Tony" and himself as the perpetrators. Coleman later admitted to police, however, that Defendant and Caldwell were his accomplices, explaining that he had lied at first to protect his friends. Defendant additionally challenges the credibility of Coleman and Caldwell based upon their plea agreements with the State whereby they received a substantial benefit in their own cases in exchange for their testimony against Defendant. The State revealed the existence of those plea agreements to the jury, however, and the trial court instructed the jury to view the accomplice testimony with great caution and suspicion.
Next, Defendant points out that the fingerprints of Coleman's and Caldwell's fingerprints were found inside the vehicles from Hopkins and Foster, but his were not. However, the jury could have reasonably believed that Defendant was inside those vehicles but simply did not leave any prints that were identifiable.
Finally, Defendant claims that while Coleman and Caldwell matched the physical description given by the victims, he did not. The victims described the three robbers as short, medium and tall. The short one, later identified as Coleman, was described as five foot six or five foot seven, one hundred fifty pounds. Coleman is actually five foot nine. The medium size robber, later identified as Caldwell, was described as five foot ten to six feet, one hundred seventy pounds. Caldwell is actually five foot ten or five foot eleven. Defendant, the tallest of the three robbers, was described as six feet, one hundred eighty to two hundred pounds. While this description may not be as accurate as those given for Coleman and Caldwell, Defendant being taller and heavier, the investigating detective testified that it is not unusual for witnesses to inaccurately estimate height and weight. Moreover, Defendant was identified as one of the perpetrators by both Coleman and Caldwell, and tentatively identified by the second victim, Mr. Foster.
The jury had the opportunity to see and hear the witnesses who testified, including Defendant, and observe their demeanor. It was up to the jury to resolve conflicts in the evidence, determining which witnesses to believe and the weight to be given to their testimony. State v. DeHass (1967), 10 Ohio St.2d 230. In reviewing this entire record as a whole we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has occurred. Defendant's conviction is not against the manifest weight of the evidence.
The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR (WHETHER) THE COURT ERRED WHEN IT DISPLAYED ANTAGONISTIC ATTITUDES TOWARD THE DEFENDANT'S COUNSEL AND BY NOT ACCORDING DEFENDANT WITH A FAIR AND UNBIASED MAGISTRATE, WHICH KEPT DEFENDANT FROM RECEIVING A FAIR TRIAL AND VIOLATED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.
Defendant-Appellant's trial counsel interrupted the prosecutor's direct examination of Gregory Caldwell with a number of objections concerning the form of the questions the prosecutor had asked. The court overruled the objections. When defense counsel persisted, the court sent the jury out of the room and lectured defense counsel concerning his behavior and the court's expectations of him. (T. 431-437).
Defendant-Appellant argues that this episode amounted to "biased and disrespectful court commentary," and that "there is a real probability that the antagonisms between the court and counsel interfered with the ability of the defense to show the emptiness in the evidence linking Defendant to these robberies." (Brief, p. 14). Defendant-Appellant also argues that the court's later comment to counsel, ". . . don't give me that crap," and "Maybe because of your attitude and behavior throughout this trial . . . what goes around, comes around" (T. 764), was hostile and intimidating.
Ohio's system of courts is not a unified system. Therefore, the "superior" intermediate appellate courts generally have no power to supervise the workings of the "inferior" trial courts, except to the extent that an error of law prejudicial to the rights of the litigants is demonstrated. Otherwise, matters that occur in the course of trial proceedings are beyond our review or power to correct.
The statements by the court of which Defendant-Appellant complains occurred outside the presence of the jury. The prosecutor's badgering of the witness Caldwell about whether he and the other two perpetrators had a "plan" (T. 426-427) may have provoked defense counsel's objections, but those particular objections were baseless. We find nothing wrong in the court's admonitions, which were an effort to keep the trial on course.
Defendant-Appellant also complains that the prosecuting attorney in her rebuttal argument launched attacks on his counsel personally, saying he was asking the jury to "feel sorry" for him and calling that a "cheap shot." She also implied that he was a "peacock" (T. 892), according to Defendant-Appellant.
The prosecutor's remarks appear to be in response to defense counsel's effort to persuade the jury that he'd been unfairly treated by the court and the prosecutor. For example, he apologized to Defendant-Appellant for not being able to give him a "better defense," and for allowing his "frustrations" to direct him. (T. 862). He also apologized to the jury for letting the trial "turn into a referendum on Ms. Howland's (the prosecutor's) personality." (T. 864). Counsel even remarked that the judge had "tried cases as a prosecuting attorney" (T. 865), suggesting that the court was biased in favor of the State. The prosecutor objected, and the court properly sustained the objection.
A reading of the transcript does not present a model of trial diplomacy. Both sides tested the court's patience, and defense counsel gave as good as he got. At one point he conceded, "Fine, I have been a jerk." (T. 764). We cannot say that he was, but neither can we find that he was intimidated from providing Defendant-Appellant a vigorous defense. Unless his capacity to do that was impaired by the court, there is no basis to reverse.
A necessary element of professionalism is a sense of independence on the part of the professional from the matters in issue. Comments directed personally at an adversary are inconsistent with that concept, as are comments extolling or explaining an advocate's own acts in a trial proceeding. Defense counsel's remarks are contrary to that principle, but he was not alone.
The transcript of the prosecutor's rebuttal argument contains thirty-four references to herself in the form of pronouns of the first person (T. 889-897). For example, after calling defense counsel's effort to win the jury's sympathy a "cheap shot," the prosecutor added:
 "You know, I do my homework. That's just part of my job. It's real simple. I don't know Steve Golson. I don't care about Steve Golson. This isn't my part. This is me doing my job and giving you the evidence. That's all there is. There's nothing personal about it for me. I don't want you to feel sorry for Mr. Martino." (T. 892).
At some point, the weight and nature of arguments of that kind diverts the jury's concern from the evidence and the law the court instructs it to follow, focusing the jury's concern instead on counsel's own performance. It implies that a not guilty verdict might impugn the prosecutor herself. In that respect, it is improper.
It is the function and responsibility of the trial court, not the appellate court, to control the behavior of trial counsel. The trial judge did her best to do that here, contending with the excesses committed by both sides. We cannot find that, on this record, Defendant-Appellant was prejudiced by the matters involved. The weight of the evidence against Defendant-Appellant was substantial, and that weight rendered superfluous the distractions which these matter presented.
The second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR (WHETHER) THE COURT ERRED WHEN IT SENTENCED DEFENDANT TO A PRISON TERM SUBSTANTIALLY GREATER THAN THAT RECEIVED BY OTHER DEFENDANTS BECAUSE HE EXERCISED HIS RIGHT TO A JURY TRIAL AND THEREBY VIOLATED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION.
Defendant-Appellant Golson was convicted of two first degree felonies and one second degree felony, each with firearm specifications. He was sentenced to serve twenty-nine years in prison. In contrast, his confederates, who entered guilty pleas, were sentenced to far less. Coleman, who was a juvenile, remained in the juvenile system and was sentenced to four years. Caldwell was sentenced to eleven years on two first degree felonies and one firearms specification.
Defendant-Appellant argues that the disparity between his sentence and the sentences imposed on Coleman and Caldwell penalizes him for exercising his right to trial instead of pleading guilty. The injustice involved is underscored, according to Defendant-Appellant, by the fact that the evidence presented at trial tends to show that he was less culpable than the other two.
The record demonstrates that, prior to trial, on February 5, 1999, the State offered Defendant-Appellant its recommendation of a thirteen year sentence in exchange for a guilty plea. (T. 5). The prosecutor added that if Defendant-Appellant went to trial and was convicted, "I will go for the max." (T. 6).
The trial court cautioned Defendant-Appellant to consider the State's offer carefully, adding that "I have already said that in this case I can accept the eleven years with the other defendant." (Id.), and that "I don't know enough about this case to say whether eleven years is what I would give at trial." (T. 7). The court further advised Defendant-Appellant that "you're looking at the upper 30 years on this (set of charges)." (Id.) After hearing this advice, Golson declined the State's plea bargain offer.
"A trial court is granted wide discretion in imposing sentence as long as the sentence is within statutory guidelines. A sentence with the guidelines will not be disturbed on appeal absent an abuse of discretion." State v. Patterson (May 2, 1997), Montgomery App. No. 15699, unreported, at p. 9, citing Toledo v. Reasoner (1965),5 Ohio St.2d 22, 24.
"The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151, 157. For a trial court's ruling to constitute an abuse of discretion, the ruling "must be `so palpably and grossly violated of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion and bias.'" State v. Aldridge (1997),120 Ohio App.3d 122, 140, quoting Nakoff v. Fairview Gen. Hosp. (1996),75 Ohio St.3d 254, 256.
There is no requirement that co-defendants be sentenced equally. To the contrary, even in a death penalty case, disparity of co-defendants' sentences does not justify reversal where the sentence is neither illegal nor an abuse of discretion. State v. Jamison (1990), 49 Ohio St.3d 182. Further, a defendant is not entitled to a presumption that the trial court judge acted vindictively or punitively in sentencing simply because his co-defendants received shorter sentences. Patterson, supra, at p. 10.
The trial court, in the course of a six-day trial, most likely learned far more about the offenses involved that it knew when it took Caldwell's guilty plea. That information portrayed serious acts of violence, including an effort to kill one of the victims. Further, Caldwell was convicted of but two felony offenses while Defendant-Appellant was convicted of three. Finally, the court could properly afford Caldwell some leniency in sentencing because of his plea, which acknowledged his guilt and assumed moral responsibility for his own acts. Patterson, supra. We find no abuse of discretion.
The third assignment of error is overruled.
The judgment of the trial court will be affirmed.
 ______________ GRADY, J.
BROGAN, J. and YOUNG, J., concur.