DECISION.
{¶ 1} The defendant-appellant, Michael S. Hout, appeals from his conviction for murder with two firearm specifications. He was sentenced to 18 years to life imprisonment in the Department of Corrections. He presents four assignments of error: (1) that the state failed to exchange exculpatory material and witness statements in violation of Crim.R. 16; (2) that his conviction was contrary to the manifest weight of the evidence; (3) that his defense was prejudiced by instances of prosecutorial misconduct; and (4) that he was entitled to an instruction on the lesser-included offense of negligent homicide. For the reasons that follow, we hold that none of the assignments involve reversible error and thus affirm Hout's conviction and sentence.
 The Shooting {¶ 2} The state presented evidence that Hout, while on parole for another offense, shot and killed Zonate Irby. Irby was a drug dealer whose house on the day of the murder was found to contain marijuana, thousands of dollars in cash, weaponry (including an AK-47 rifle), and a bulletproof vest. The shooting occurred in the yard next to Irby's front porch. Irby's sister, Tiffany, who was living at the residence with her young daughter, testified that she was sitting on the couch in the front room late in the afternoon when her brother responded to a ring at the door. According to Tiffany, Irby went to the door without any weapon, closing the barred screen door behind him. She recalled hearing two gunshots and testified that when she ran to the door, she saw her brother lying on the grass and a man, whom she identified as Hout, standing over him. She testified that she saw a girl close by who also had a gun. According to Tiffany, the girl was screaming words such as "kill" and "get that whore ass nigger." She further testified that she fled inside when Hout brandished the gun at her.
 {¶ 3} Two other witnesses were inside the Irby residence at the time of the shooting, James Dickey and Timothy Brown. Brown did not testify. Dickey testified that the two men were involved in a painting/household-repair project when they heard the shots. They responded by also looking out the front door. Dickey identified Hout as the man he saw going through Irby's pockets as Irby lay sprawled on the ground. He testified that Hout brandished a gun and threatened to kill both him and Brown if they did not "back off." Both men, according to Dickey, quickly retreated back into the house.
 {¶ 4} Tiffany testified that, after seeing Hout standing over the body of her bother and being threatened by him with a gun, she ran upstairs to where she knew her brother kept a gun under the pillow of the bed. Retrieving the weapon, a 9mm Smith Wesson (Model 5906) revolver, loaded with 9mm Speer bullets, she ran back downstairs, where the Smith Wesson ended up in the hands of Dickey. Dickey and Brown, now armed with the weapon, went back out onto the front porch. Dickey testified that he saw Hout running from the scene and into a car containing other passengers.
 {¶ 5} A third witness, a neighbor, Corneal Miller, testified that he had earlier watched as Hout and his companions, who were in separate cars (one light blue, the other tan), "case[d]" the street and then parked to allow Hout and a female companion to walk up to Irby's porch. According to Miller, another, shorter man had also exited from one of vehicles and taken up a position on the sidewalk as Hout and the woman approached the Irby residence. Miller testified that he had watched as Hout struggled with Irby, after the latter had opened the door. Miller recalled that he saw Hout produce a gun (he was unable to say from where, although he thought it was from near his waistband), which he first described as a revolver.[1] He testified that he watched as Hout shot Irby and then appeared to be fumbling with Irby's body or his clothes before setting off down the street, gun in hand, shouting, "I should have shot all those mother fuckers." Miller testified that Hout still had the gun in his hand when he got into the automobile that drove him away.
 {¶ 6} After calling for emergency assistance, Tiffany, Dickey and Brown attempted to comfort Irby, who was drifting into a state of unconsciousness. Dickey testified that he had tucked the Smith 
Wesson revolver into his waistband, deciding not to try to shoot at the fleeing Hout. Emergency medical personnel arrived along with the police, and Irby was transported to the hospital, where he later died from his wounds. Examining the crime scene, the police discovered a wallet that contained a $100 bill and a photo identification of Hout. Spent shell casings, identified as Luger 9mm, were also recovered from the crime scene. The shell casings were tested unsuccessfully for fingerprints.
 {¶ 7} While interviewing witnesses, the police discovered the Smith Wesson revolver on Dickey and arrested him for carrying a concealed weapon. Meanwhile, Hout's parole officer was notified, and Hout was arrested in the Columbus, Ohio, area within a matter of days. At the time of his arrest, Hout's car was found to contain what the state described as items designed to facilitate a "home invasion"-type burglary, including two license plates, gloves, cartridges for automatic weapons, plastic handcuffs ("flex cuffs"), and "heavy-duty" duct tape. This evidence supported the state's theory of the case, which was that Hout and his accomplices had driven from Columbus on the day of the killing for the calculated purpose of committing a "home invasion" robbery of Irby's house, knowing that he was a drug dealer and would likely have a large amount of cash on the premises.
 {¶ 8} The weapon that discharged the rounds into Irby's body was never found.
 Hout's Version of The Events {¶ 9} During interrogation, Hout initially denied any knowledge of the Irby shooting. Informed that the police had recovered his wallet from the crime scene, Hout, according to the detective who had interviewed him (David Feldhaus), admitted that he had lied, began to cry, and claimed that he was not a murderer. He then related to the police an account that, with certain exceptions, approximated his testimony at trial.
 {¶ 10} Hout testified that the events that led to the shooting had actually begun the day before, when he had come to Cincinnati with two friends to visit another friend, Phillip Owens. He stated that he brought with him $380 in cash because the original plan was to gamble at a riverboat casino. He testified that those plans fell through, and that instead he and his friends played video games in Owens's apartment until he and Owens left to go to a White Castle restaurant. At the White Castle, he testified, Owens met Irby, with whom Owens was familiar, and then all three got into Irby's truck, in which Irby and Owens smoked a joint while driving around. Hout testified that he did not smoke any of the marijuana because of his asthma and the fact that he did not want to take the risk of failing a drug test during a scheduled meeting with his parole officer the next morning.
 {¶ 11} Hout testified that, after driving around with Irby and Owens, they decided to buy drinks at a drive-through store, and that he bought an Arizona Tea, which he paid for with money from his wallet. Then, according to Hout, after driving around some more in Irby's truck, they went back to the White Castle, and he and Owens got out of Irby's truck and back into Owens's vehicle. At that point, according to Hout, unbeknownst to him, he had left his wallet in Irby's truck.
 {¶ 12} Hout testified that he drove back to Columbus that night in order to make the morning appointment with his parole officer. Along the way, while stopping to purchase gasoline, he noticed that his wallet was missing. According to Hout, because he was so close to Columbus, and because he did not want to miss his morning appointment, he decided to go on to Columbus and to return to Cincinnati the next day to track down his wallet. He testified that during the remaining drive he used his cellular phone to call both Fifth-Third Bank and his credit-card company, whose numbers he claimed to have memorized, in order to check his balances to determine if there had been any recent unusual activity. To support this contention, he submitted into evidence his cellular phone bill, which showed two 800-number calls on the night in question.
 {¶ 13} Hout testified that, after meeting with his probation officer the next morning, he and two male friends, Omar Greggs and Kevin Keels (nicknamed "KK"), along with an unnamed female, decided to return to Cincinnati. According to Hout, the plan was to go to Irby's address in Cincinnati, where Owens claimed that his wallet could be found. Owens was not in the car but, according to Hout, was giving them directions by cellular phone. When Hout and his friends arrived at the correct address, Hout testified, the female accompanied him to Irby's door because she was mad at another of the friends who had come along.
 {¶ 14} According to Hout, when he and the female rang the doorbell of Irby's home, he, Hout, was unarmed, having only his cellular phone and an inhaler in his pocket. He denied going to the porch armed with a gun. He stated that Irby answered the door, saw who was there, and then went back into the house to retrieve Hout's wallet. He testified that when Irby returned with his wallet, he opened it and discovered that the cash was missing. He stated that when he asked Irby about the missing money, Irby disclaimed any knowledge of its whereabouts but offered to go back inside and check to see if anybody else in the house knew anything about it
 {¶ 15} According to Hout, when Irby came back, he rushed by the metal screen door, pushed him backward, and began brandishing a gun — a black Glock semi-automatic. Hout stated that he grabbed the gun, and that they both then fell backward, breaking the railing. In the melee, Hout claimed, he heard the gun go off, first before the fall to the yard, and then instantly afterward. He claimed that the gun went off a third time as the men continued to struggle. After the third shot, according to Hout, he was able to get up and push Irby away from him. At that point, he testified, he heard two men and a woman (presumably Dickey, Brown, and Tiffany) saying, "Get the gun. Get the gun." He testified that he quickly picked up his cellular phone and inhaler and then looked for his wallet briefly, but gave up and began running down the street, hearing threatening voices behind him. He testified that his friend drove the car by to pick him up, and that he got in, telling his friends over and over that Irby had tried to kill him. The female with whom he had gone to Irby's porch, Hout testified, was also in the car.
 {¶ 16} To support his theory that the murder weapon belonged to Irby and had been presumably secreted by either Tiffany, Dickey, Brown, or someone else working with them after the shooting, Hout presented the testimony of Edward Edmondson, another of Irby's neighbors. Edmondson testified that on the day of the shooting he heard shots, called for emergency assistance, and then watched the aftermath of the shooting through his dining-room window. He testified that he gave a written statement to Detective Ruth Hunt. According to Edmondson, he saw Brown leaning over the body with a black semi-automatic, "heavy looking" gun, resembling a Glock similar to the one he, Edmondson, had previously owned. Although Edmondson testified that he believed the weapon in Brown's hand was a Glock, he conceded that he had first told the 911 operator that the weapon he saw was a Smith Wesson. Upon cross-examination, he stated that he had done so because "[t]hat was the first manufacturer of a gun that came to my mind at the time." He also conceded that the police arrived at the scene quickly and that he never saw the gun leave Brown's hand.
 {¶ 17} The credibility of Hout's version of events, it should be noted, was impugned in several respects. First, Hout's credibility was damaged when the prosecutor elicited upon cross-examination that Hout had previous convictions for forgery, perjury, and credit-card fraud. Ebony Huff, Phil Owens's girlfriend in whose apartment Owens was living at the time in question, denied that Hout had been in the apartment on the day before the killing. Owens, whose testimony may have corroborated Hout's, did not testify at trial. Neither did any of Hout's companions who drove with him to Irby's residence. Police detectives testified that Hout had originally admitted to the police that he and his companions had driven to Cincinnati in two separate cars, as testified to by Miller — a fact denied by Hout at trial. Hout's testimony concerning the particulars of the shooting was also refuted by the testimony of the coroner that Irby's wounds were inconsistent with the scenario Hout proffered, and that the defensive wounds to Irby's arms supported the state's theory that he had been shot as Hout was leaning over him.
 Brady and Other Discovery Issues {¶ 18} In his first assignment of error, Hout asserts that the trial court erred by denying his motion for a new trial based on what he asserts was the state's failure to exchange exculpatory material, as required by Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194. That material, according to Hout, both supported his theory of self-defense and bore upon the credibility of the state's witnesses. We discuss each of these allegations in turn.
 1. Witness Statements {¶ 19} Under Crim.R. 16, witness statements are discoverable in two instances. First, if the statements are exculpatory, in other words, Brady material, they are discoverable under Crim.R. 16(B)(1)(f) regardless of their form. Disclosure of such information is a constitutional imperative. Brady material includes all evidence that is favorable to the accused and is material to the issue of guilt or punishment. Brady, supra. See, also, State v. Johnston (1988),39 Ohio St.3d 48, 529 N.E.2d 898, paragraph four of the syllabus. The test for materiality is whether there exists a "reasonable probability" that, had the state disclosed such evidence, the outcome of the trial would have been different; in other words, it is a probability sufficient to undermine confidence in the conviction. United States v. Bagley
(1985), 473 U.S. 667, 682, 105 S.Ct. 3375; Johnston, supra, paragraph five of the syllabus. Brady material includes impeachment evidence under the same test of materiality. Bagley, supra, at 676, 105 S.Ct. 3375;State v. Aldridge (1997), 120 Ohio App.3d 122, 137, 687 N.E.2d 228. Brady material, it should be noted, is required by Crim.R. 16(B)(1)(f) to be exchanged prior to trial.
 {¶ 20} Second, once a witness has testified, his statement may be discoverable under Crim.R. 16(B)(1)(g). On motion of the defendant, that subsection requires the court to conduct an in camera inspection with counsel of any previous "written or recorded statement" of the witness to determine the presence of any inconsistencies. If, in the determination of the court, such inconsistencies exist, counsel is then entitled to the statement for its use in cross-examination. If the trial court determines that no inconsistencies exist, or less than the entire statement is disclosed, the rule provides that the "entire statement * * * shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal." Id.
 {¶ 21} Unlike Brady material, in order to trigger the disclosure requirements of Crim.R. 16(B)(1)(g), statements made to police officers must meet certain requirements. This court, along with other Ohio appellate courts, has held that they must be either signed and written by the witness, signed by others and either approved or adopted by the witness, recorded or transcribed, or constitute a substantially verbatim recital of the witness's statement in a continuous narrative form. Statev. Allen (1990), 69 Ohio 3d 366, 372, 590 N.E.2d 1272. See, also, Statev. Johnson (1978), 62 Ohio App.2d 31, 403 N.E.2d 1003; State v. Cummings
(1985), 23 Ohio App.3d 40, 491 N.E.2d 354; and State v. Washington
(1978), 56 Ohio App.2d 129, 381 N.E.2d 1142. In Allen, we acknowledged that there appeared to be "a logical inconsistency in permitting a defendant access to evidence that is favorable to him merely by its potential for impeachment," while denying a defendant "access to the same evidence under Crim.R. 16(B)(1)g) because it does not constitute a `statement' within the meaning of the rule." Id.
 A. Statements by Tiffany Irby {¶ 22} Hout alleges that the state failed to disclose that Tiffany had made a statement or statements to the police that she had seen another person near Irby's body after the shooting. According to Hout, this unidentified third person may have "secreted" the murder weapon, and thus Tiffany's statement was exculpatory. Hout also accuses the state of failing to disclose that Tiffany had told the police that Brown "had overturned the couch, looking for the murder weapon" — by which he means the 9mm Glock that Hout insisted Irby had owned and used to attack him. Further, he alleges that the state failed to disclose statements to the police by Tiffany that the gun she saw Hout holding was silver, not black.
 {¶ 23} Initially, we note that Tiffany's statements regarding another unidentified person at the crime scene, after the shooting, would not necessarily have been exculpatory since they would not have affected at all the evidence concerning the actual shooting. (Hout did not testify that there was a third person involved in his scuffle with Irby.) Hout insists, though, that the person's presence may have lent some credibility to his claim that the murder weapon belonged to Irby, and that Tiffany, Dickey, and Brown, and perhaps some unknown person, were involved in a coverup after the shooting to make it seem that he, not Irby, had produced the weapon and carried it off. The difficulty with this reasoning, however, is that Tiffany testified only that there was some other person standing on the periphery after the shooting. She did not testify that she knew the person, or that the person was in any way connected to the shooting, or that the person picked up anything resembling a weapon. The person could have easily been a stranger.
 {¶ 24} Nor do we accept the favorable spin Hout has put on other aspects of Tiffany's testimony as to what she may have said to the police. Tiffany obviously did not testify that she told the police that Dickey overturned the cushions of the couch, "looking for the murder weapon." It was her testimony that, while she went upstairs to retrieve the Smith Wesson, which she knew her brother kept under the bed, Dickey and Brown also searched the downstairs for a weapon because all three were aware that Irby kept guns in the house. She stated, "Timothy Brown was looking for a gun, closer. Something to protect my brother." With respect to the color of the gun or guns, she testified that she told the police that she was not sure whether the gun Hout was holding was silver or black, but that she was sure that the girl had a silver gun. None of this information, even if it was told to the police in earlier statements, strikes us as exculpatory in the sense contemplated byBrady.
 {¶ 25} As for statements available under Crim.R. 16(B)(1)(g), it is the state's position that Hout was given a complete copy of the one — and only — taped statement that Tiffany made to the police, which was obtained by Detective Robert Herald of District 5 on the day of the shooting. The state's position is consistent with that of the prosecution during trial, which adamantly denied that there were "a bunch of" statements" from Tiffany.
 {¶ 26} The problem with the state's argument, however, is that Detective David Feldhaus, a homicide investigator, testified unequivocally that he personally took another taped statement from Tiffany as part of his later investigation of the case after Irby had died. Based upon this testimony, Hout's counsel insisted during trial that the state had more than one taped statement — only to be met by the prosecution's equal insistence that it did not. Further, Hout's counsel requested the court that she be allowed to inspect the notes of yet another interview of Tiffany, which was disclosed by the testimony of Detective Rachel Hunt.
 {¶ 27} With respect to Detective Hunt's notes of her interview with Tiffany, there is no basis in the record for us to conclude that they met any of the requirements for a "statement" under Crim.R. 16(B)(1)(g). The issue of the taped statement obtained by Detective Feldhaus, however, is much more problematic. Such a recording would have constituted a statement of a witness under Crim.R. 16. Since Detective Feldhaus clearly testified that he had obtained such a statement, we can only assume that another taped statement did, in fact, exist. The state's failure to produce the taped statement for in camera inspection, when requested by the defense, violated Crim.R. 16(B)(1)(g).
 {¶ 28} The state's failure to comply with Crim.R. 16 amounts to reversible error, however, only when it is shown that the violation was willful, that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or that the accused was otherwise prejudiced. State v. Parson (1983), 6 Ohio St.3d 442,453 N.E.2d 689, syllabus.
 {¶ 29} Because the police are part of the state's "prosecutorial machinery," a police officer's knowledge of a statement is generally imputed to the state. See State v. Robinson (1981), 1st Dist. No. C-810117, citing State v. Wiles (1991), 59 Ohio St.3d 71, 78,571 N.E.2d 110. But aside from this vicarious imputation, there is no basis in this case to conclude that the state's failure to produce the Feldhaus tape was willful in the sense that the prosecution knew that it was wrong when it denied having any other taped statement of a police interview with Tiffany.
 {¶ 30} As for the demonstration of prejudice, our review of this issue is foreclosed because the taped statement was apparently never produced — at least it is not part of the record. Nor is there any indication from Detective Feldhaus's testimony that the taped statement contained anything inconsistent with Tiffany's testimony at trial. Compare Blevins, supra. Even if we assume that Detective Feldhaus's interview touched upon the same subjects (the color of the gun, the presence of other persons, Irby's alleged ownership of a 9mm Glock), there is no way for us to know if she said anything during the interview inconsistent with her later testimony, or, if she did, whether such inconsistency as it existed would have been sufficient to establish the necessary prejudice.
 {¶ 31} On this record, therefore, we cannot detect any prejudice resulting from the state's failure to produce Tiffany's taped statement obtained by Detective Feldhaus. But again, as we have done in other cases, we are forced to admonish the state that such inattention to detail to discovery might, on another record, require a finding of prejudicial error. As we have previously noted, and emphasize again, "[i]t is surely better for the state to spend a bit more effort complying with discovery than in defending an appeal and perhaps prosecuting a new trial." State v. Pettit (Jan. 15, 1999), 1st Dist. No. C-980261.
 B. Statements By Dickey {¶ 32} Hout also alleges that Dickey had made a statement to the police that Irby always kept a 9mm handgun under the cushions of the downstairs couch. In perhaps the most intriguing testimony of the entire trial, Dickey testified upon cross-examination that he searched under the downstairs couch because Irby "usually had a 9mm or something" hidden there. Defense counsel then asked whether the 9mm gun was a Glock, to which Dickey, offering the defense crucial support for its theory of the case, replied, "Yeah." However, on redirect, the prosecution quickly engaged Dickey in the following exchange:
 {¶ 33} Q. "Maybe I misheard your testimony. Did you testify that [Irby] always kept a Glock 9mm handgun by that couch?"
 {¶ 34} A. "Well, he kept, yeah, a weapon there around the house."
 {¶ 35} Q. "Did you testify that was a Glock 9mm handgun?"
 {¶ 36} A. "No, I didn't testify to that."
 {¶ 37} Q. "Did you ever see a Glock 9mm handgun in that house that day?"
 {¶ 38} A. "No."
 {¶ 39} We agree with Hout that if Dickey had made an earlier statement to the police that Irby kept a 9mm handgun on the premises, such a statement, depending upon what was actually said about the gun, could, potentially, have been exculpatory under Brady and should have been exchanged before trial under Crim.R. 16(B)(1)(f). Such a statement, depending upon the context, may have lent support to Hout's theory of the case, that it was Irby, not he, who had produced the weapon, thus lending credibility to his claim that he did not go to the house intending to kill Irby.
 {¶ 40} The record demonstrates that Dickey made one taped statement to the police, again to Detective Herald on the day of the shooting. This statement was produced by the prosecution at trial under Crim. R. 16(B)(1)(g), but not, apparently, disclosed prior to trial as exculpatory material under Crim.R.16(B)(1)(f). A transcription of the taped statement is, fortunately, part of the record. In it, Dickey did not state anywhere that Irby had kept a 9mm Glock under the couch. Indeed, he made no statement even remotely to suggest that. The statement was largely consistent with his testimony at trial and was not exculpatory in any way that we can discern.
 C. Statements by Miller and "Other Interviewed Neighbors" {¶ 41} Hout alleges further that the prosecution failed to disclose an earlier statement to the police by Miller that he had seen two people other than the defendant after the shooting. According to the prosecution, however, Hout was given, prior to Miller's cross-examination, the only taped statement from Miller that the state possessed, which had been obtained by Detective Feldhaus and his investigative team. Although the state concedes that Miller was also interviewed by Detective Hunt, the state claims that all it had from that interview were the detective's notes, which were not signed or adopted by Miller, and therefore that this did not constitute a statement for the purposes of Crim.R. 16(B)(1)(g).
 {¶ 42} Having reviewed the statements that are in the record, we find nothing that would dispute the prosecution's assertion. Miller's alleged statement regarding other persons was not Brady material under Crim.R. 16(B)(1)(f), because, similar to Tiffany's statement regarding another person, there was nothing to identify who that person or those persons might have been. Nor, because there was no evidence that Miller ever signed or adopted the notes take by Detective Hunt of her interview, was there any further violation of Crim.R.16(B)(1)(g). Similarly, we do not find any evidence in the record to support the contention that the state withheld any statements of other interviewed neighbors under either subsection (f) or subsection (g) of Crim.R. 16(B)(1).
 2. Physical Evidence {¶ 43} Hout also claims that the state "held back" certain exculpatory physical evidence, including photographs showing the overturned couch, obtained by Detective Hunt. According to the prosecution, however, it turned over Detective Hunt's photographs as soon as it became aware of them. The prosecution stated, "As to Detective Hunt's photos. Detective Hunt is retired. When she came to court she brought a file we never knew existed. On the date [Hout's trial attorney] saw those photos, that's the date I saw them for the first time. * * * Again, I want to emphasize, I saw them for the very first time, the time retired Ruth Hunt came to the court, the same day [Hout's trial attorney] saw them for the first time."
 {¶ 44} There is nothing in the record to refute the prosecution's statement. Hout's trial counsel did not, as far as we can deduce from the record, request a continuance after she was given the photographs, and, in fact, later used the photographs during the trial. This being so, there was no violation of Crim.R. 16, and, even if there had been, there was no palpable prejudice resulting from the delay in exchanging the photographs.
 {¶ 45} The second piece of physical evidence Hout claims that the state "held back" was a holster found in the house, which, Hout claims, fit "a 9mm handgun identical to a Glock." At trial, the state, responding to this claim, stated that it had produced the holster in discovery and that Hout's counsel "had every opportunity to use the fact that there was an empty handgun case found in that house when a search was done." This being so, we cannot conclude that the state violated Crim.R. 16 by withholding any information concerning the holster.
 {¶ 46} Third, Hout claims that the state should have disclosed prior to trial that the bullet casings failed to produce any identifying fingerprints. We agree with the state, however, that this evidence was neither exculpatory nor inculpatory. See State v. Apanovitch (1966),113 Ohio App.3d 591, 681 N.E.2d 961.
3. Alleged Deals Struck by the Prosecution with Brown, Owens, and Greggs
 {¶ 47} Hout maintains that the subsequent dismissal of the concealed-weapon charge against Dickey (who had been arrested by the police after they discovered the Smith Wesson revolver upon his person) was the product of a deal struck with the prosecution in exchange for his testimony. The state denies that such a deal was made, and there is nothing in the record to dispute this. Apparently Dickey pleaded no contest, and the trial court acquitted him on the unusual, and arguably extenuating, facts.
 {¶ 48} As for Greggs, his statement to the police (which was not admitted at trial) was particularly damaging to the defense, asserting that Hout had come to Cincinnati — with a Glock to "fuck [Irby] up]" in order to exact revenge for a drug deal gone awry. There was no evidence that the prosecution ever struck a deal to keep him from testifying — indeed, given his statement, Hout would have been foolish to have called him as a witness, and one cannot help but wonder why the prosecution chose not to.
 {¶ 49} Similarly, Owens did not testify to support Hout's version of the events, in which Owens was a principal actor. According to Hout, Owens was released on his own recognizance on five separate domestic-violence cases as some sort of ploy by the state to deprive him of "easy pretrial access to him for interview purposes." There is nothing in the record to support such a charge.
 4. The Statement of Brown {¶ 50} According to Hout's defense counsel in her motion for a new trial, she was never given any statements to the police made by Brown at any point before or during the trial. As she stated in the motion, "Of course, defense counsel has not seen any of Brown's statements, but fears that they, also, contain evidence favorable."
 {¶ 51} Because Brown did not testify, his statements were not subject to disclosure under Crim.R. 16(B)(1)(g). But even if he did not testify, any exculpatory information he gave to the police had to be exchanged prior to trial under Crim.R. 16(B)(1)(f). For some reason not clear to us, in an envelope marked "statements of all witnesses," the record contains a statement by Brown given to the police on December 30, 2001. Apparently Hout's appellate counsel has overlooked this statement, because its contents are not discussed in his appellate brief. But they should have been, so we raise the issue of Brown's statement now, sua sponte, because some of the information contained in the statement merits discussion.
 {¶ 52} As noted, Dickey testified that Irby kept a 9mm gun under the front-room couch. Although he at first testified that it was a Glock, he then retracted that statement on redirect examination. Still, Dickey's testimony allowed for the possibility that there was a third weapon — a 9mm gun — in the Irby house on the day of the shooting. Dickey's earlier statement to the police did not touch on this subject. In closing argument, the prosecution emphasized the point that there were, apparently, only two weapons retrieved after the shooting — the AK-47 assault rifle, which was obviously not the murder weapon, and the 9mm Smith Wesson, which was loaded with Speer ammunition, not with the Luger ammunition retrieved from Irby's body.
 {¶ 53} In his statement to police, Brown solidly corroborated Dickey's statement and testimony that the two men, responding to the gunshots, went outside and saw Hout bending over Irby, holding a weapon (which he described as a black 9mm), and rifling through Irby's pockets. In this respect, Brown's statement was anything but exculpatory. However, Brown also revealed that, when he went back into the apartment after first being threatened by Hout, he began his own search for a weapon and found a gun, which he identified as a 9mm, in "a leather cowhide-like case in the globe behind the front door." Elsewhere, he described the gun as "black." He testified that he tried to put a round in the chamber but was unable to load the weapon. Asked by Detective Feldhaus what he then did with the weapon, Brown stated, "I laid it down. I don't quite remember where I laid it, whether it was on the couch or if I put it back in the globe or back in the case, but I was never outside." Detective Feldhaus then asked, "But you put the gun in the house?" Brown responded, "Yeah." According to Brown, after leaving the 9mm black, and apparently unloadable, gun in the house, he then accompanied Dickey, who was now armed with the Smith Wesson, back outside. Detective Feldhaus asked later if the gun ever left the Irby house, to which Brown responded, "No." Asked if the gun could have possibly been the same gun Hout had in his hand as he knelt over Irby's body, Brown unequivocally responded, "No."
 {¶ 54} The question becomes whether this statement, identifying another weapon in the house, a black 9mm, was exculpatory under Brady and should have been disclosed to the defense prior to trial, or at least at some point during trial when the defense's theory of the case was made fully known to the prosecution. We hold that it was not. Concededly, Brown's statement did identify a third gun, a black 9mm, in the Irby house at the time of the shooting. But Brown's statement also precluded the possibility that this third weapon could have been the murder weapon, since he stated that he had found the weapon in the house, "in the globe," while Hout was standing outside brandishing another weapon, the murder weapon, in his hand above Irby's body. In short, it was physically impossible for the gun to have been the murder weapon unless it were somehow possible for the weapon to have been in two different persons' hands at the same time. It would perhaps have been better practice for the state to have erred on the side of caution and to have exchanged the statement, since it was relevant to the weaponry that was in the house during the time the shooting took place outside, but we cannot say that the statement, judged in context, was materially exculpatory in the sense that it would have undermined confidence in the verdict reached in this case.
 {¶ 55} Accordingly, Hout's first assignment of error is overruled.
 Manifest Weight of the Evidence {¶ 56} In his second assignment of error, Hout asserts that his murder conviction was contrary to the manifest weight of the evidence. He argues that he satisfied his burden at trial of establishing the affirmative defense of self-defense by a preponderance of the evidence.
 {¶ 57} In a weight-of-the evidence challenge, the appellate court sits as a "thirteenth juror" and reviews the evidence, determining whether the other twelve clearly lost their way or created such a manifest miscarriage of justice that the conviction must be reversed.State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. The reviewing court's authority to usurp the jury's verdict is discretionary and is to be exercised "only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. "[T]o speak of the weight of the evidence is not to describe a mathematical formulation, but, rather, to examine the effect of the evidence in inducing belief."State v. Paramore (Sept. 19, 1997), 1st Dist. No. C-960799.
 {¶ 58} Having reviewed the record, we cannot say that this is the exceptional case in which the evidence weighs heavily against a conviction. Four people, including Miller, a disinterested neighbor, saw Hout standing over Irby's body, holding a gun. Tiffany testified that her brother did not stop to retrieve a gun before answering the door. As noted by the prosecution, of all the ammunition retrieved from the house, none was of the type discharged by the gun that shot Irby. Miller testified that he saw Hout produce a weapon from around his waistband and use it to shoot Irby, thus refuting Hout's contention that the gun discharged three times accidentally. The testimony of the coroner was that Irby's wounds were defensive and inconsistent with Hout's theory of self-defense.
 {¶ 59} Furthermore, Hout could not produce a single witness from among his coterie of friends to lend an iota of support for his version of the events: Greggs, Keels, the unnamed female, and even Owens — none of them testified in Hout's defense. Ebony Huff's testimony appeared to directly contradict Hout's testimony that he had spent the day before the shooting in Cincinnati with Owens. Certainly the items found in Hout's car on the day of his arrest supported the state's theory of a planned "home-invasion" type robbery. Although Hout has attempted to create a scenario in which the murder weapon came from among the weapons Irby, a drug dealer, kept in his house, the weight of the evidence simply does not support such a theory, even if it is accepted that Irby apparently kept a 9mm gun on the first floor.
 {¶ 60} Hout's second assignment of error is overruled
 Prosecutorial Misconduct {¶ 61} In his third assignment of error, Hout claims that "theBrady material that was withheld from the defense constituted, in cumulative fashion, a de facto state of prosecutorial misconduct, which had a high probability of being outcome-determinative in this case." We overrule this assignment of error based largely upon our resolution of Hout's first assignment of error. As noted, the only instances of nondisclosure that we can discern from the record occurred with respect to the taped statement by Tiffany obtained by Detective Feldhaus, and arguably with respect to the statement by Brown. With respect to the Feldhaus tape, we are unable to say, without it, whether any prejudice occurred. As for Brown's statement regarding the 9mm weapon he found in a "globe" and then put back because he could not load it, this statement was insufficient to undermine confidence in the verdict because Brown's statement precluded the gun's use as the murder weapon. Also, Dickey had earlier testified that Irby kept a 9mm weapon in the house, making the statement largely cumulative.
 {¶ 62} Hout's third assignment of error is overruled.
 Jury Instructions {¶ 63} In his fourth and final assignment of error, Hout argues that the trial court erred by refusing to instruct the jury on what he contends was the lesser-included offense of negligent homicide.
 {¶ 64} In order for an offense to be a lesser-included offense of another, the offense must (1) carry a lesser penalty than the other; (2) as statutorily defined always be committed whenever the greater is committed; and (3) consist of one less element than the greater. Statev. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus. Even when this test is met, a charge on the lesser-included offense is not warranted unless the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense. State v. Koss (1990),40 Ohio St.3d 213, 218, 551 N.E.2d 970. When the test is not met, the facts and the evidence of the case are irrelevant. Id.
 {¶ 65} In Koss, the Ohio Supreme Court expressly rejected the proposition that murder and negligent homicide satisfy the three-part test. Negligent homicide requires that the defendant have caused death by "means of a deadly weapon or dangerous ordinance," whereas murder requires only a purposeful killing, regardless of the means. In sum, murder can be committed without committing negligent homicide, and the second prong of the Deem test is not satisfied. Id. at 219,551 N.E.2d 970.
 {¶ 66} Hout's fourth assignment of error is overruled.
 {¶ 67} Accordingly, finding no reversible error involved in any of Hout's four assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
SUNDERMANN, P.J., HILDEBRANDT and GORMAN, JJ.
[1] In his statement to a police detective, Miller indicated that he thought the gun might be a .38 and that it was "spinning." In his testimony at trial, however, Miller stated that he did not know why he had told the police that the gun was "spinning," and that he was not close enough to tell whether it was "spinning."