[Cite as *State v. Jenkins*, 2020-Ohio-5409.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|                          |   |                                |
|--------------------------|---|--------------------------------|
| STATE OF OHIO            | : |                                |
|                          | : | Appellate Case No. 28595       |
| Plaintiff-Appellee       | : |                                |
|                          | : | Trial Court Case No. 2018-CR-4403 |
| v.                       | : |                                |
|                          | : | (Criminal Appeal from          |
| MYCHAEL JULIAN JENKINS   | : | Common Pleas Court)            |
|                          | : |                                |
| Defendant-Appellant      | : |                                |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of November, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JAMES S. SWEENEY, Atty. Reg. No. 0086402, 285 South Liberty Street, Powell, Ohio 43065
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mychael Julian Jenkins was convicted after a jury trial in the Montgomery County Court of Common Pleas of having weapons while under disability. The jury acquitted Jenkins of four counts of felonious assault and accompanying firearm specifications. The trial court sentenced Jenkins to a maximum term of 36 months in prison.

{¶ 2} Jenkins appeals from his conviction, claiming that the trial court erred in failing to grant his motion to compel, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). His argument focuses on the trial court's failure to require the State to provide information from the shooting victims' cell phones. Jenkins also challenges the trial court's imposition of a maximum 36-month sentence. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 3} Between October 2016 and early November 2018, Haley Daniels and Tejay Byrd were in a relationship and lived together. On November 12, 2018, Daniels resided alone in a one-bedroom apartment; Byrd had recently moved out. Daniels testified that she and Byrd had broken up; Byrd disagreed. Byrd did not have a key to the apartment, and he had taken most of his belongings; some of Byrd's nicer clothing remained in the apartment's bedroom closet.

{¶ 4} Daniels testified that she knew Jenkins from exchanging messages with him through Facebook. Daniels stated that Jenkins had attempted to start a relationship with her several times, but she rejected all of his offers prior to November 12.

{¶ 5} In the early morning hours on November 12, Jenkins contacted Daniels via

Facebook and asked her if she wanted to smoke marijuana and hang out. Jenkins also asked if her ex-boyfriend would be there. Daniels responded that he (Byrd) would not. Daniels testified that Jenkins responded that he would shoot Byrd if Byrd showed up. (On cross-examination, defense counsel showed Daniels the Facebook messages from Jenkins's phone, which did not include that threat. Daniels claimed that the messages had been modified; Jenkins denied this.) About 30 to 45 minutes later, Jenkins asked if he could still come over. Daniels responded that he could and told him that her door was unlocked. Jenkins went to Daniels's apartment, bringing a suitcase. Daniels acknowledged that he was an invited guest to her home. Daniels and Jenkins went into the bedroom.

{¶ 6} Around 6:00 a.m., Byrd came to Daniels's apartment. Byrd's, Daniels's, and Jenkins's testimony varied regarding Byrd's demeanor, his actions, and his purpose for being at the apartment. Daniels testified that Byrd started banging on her apartment door, throwing things at her window, and then banging on her door again, damaging the door frame. Byrd stated that he knocked on the door. Jenkins testified that he heard what sounded like kicking at the door, and that Daniels had asked him (Jenkins) to get in the closet before she left to answer the door. Jenkins testified that he did not get in the closet.

{¶ 7} The testimony is consistent in that, when Daniels eventually opened the door, she told Byrd that she had company. Byrd either smacked or pushed Daniels, called her a "whore," and went into the bedroom. Byrd testified that he believed Daniels's guest was in the bathroom, that he went into the bedroom to get boots from the closet, and that he was shot as he looked for his boots. Daniels, in contrast, testified that she heard Byrd

begin to yell at Jenkins to get out and then heard multiple gunshots from the bedroom. Jenkins testified that he was getting dressed in the bedroom when he heard "whore" and then a slap, and he was tying his shoe when Byrd "rushed" into the bedroom and said, "Get the f**k out the house, bitch ass ni**er."   Jenkins testified that Byrd reached out to grab him, causing him (Jenkins) to fall back in front of the closet.   Jenkins pulled out his gun, which he had brought with him, and started shooting.

{¶ 8} Daniels ran to the bedroom, screaming, and saw Byrd slumped against a wall, holding his side.   Daniels saw flashes from the gun coming from the closet. Daniels entered the bedroom and was shot in the stomach.   Panicked, Daniels ran out of the bedroom and into the living room.   She circled back to her bedroom, where she grabbed her phone and then collapsed by the bedroom door.   Daniels and Byrd both called 911.   Jenkins jumped over Daniels and fled, leaving his belongings.   Four days later, while in the hospital, Daniels identified Jenkins as the shooter from a photospread.

{¶ 9} Daniels and Byrd both suffered serious injuries.   Daniels was in the hospital for three months and had multiple surgeries due to complications.   She testified that she lost a kidney, her gallbladder, her spleen and parts of her stomach and small intestine. She needed repairs to her pancreas, portal vein (carries blood to the liver), and inferior vena cava (carries blood to the heart), and she suffered an L2 fracture to her lower back. Daniels stated that she lost 80 pounds and all of her hair, and she had to relearn how to walk.

{¶ 10} Byrd had bullet wounds on his chest, upper abdomen, back, and left buttock area.   (The trauma surgeon did not determine which holes were entry versus exit wounds.)   Byrd lost his colon and gallbladder due to his injuries, and he required repairs

to his duodenum, small intestine, and inferior vena cava. Byrd testified that he also suffered a fracture to his back and has nerve damage. At the time of trial, Byrd did not have feeling in one leg and continued to use a wheelchair.

{¶ 11} In March 2019, Jenkins was indicted on two counts of felonious assault (serious physical harm/ deadly weapon) as to Daniels, two counts of felonious assault (serious physical harm/ deadly weapon) as to Byrd, and one count of having weapons while under disability. Each of the felonious assault charges included a firearm specification.

{¶ 12} On July 30, 2019, Jenkins filed a motion to compel *Brady* material. The motion indicated that three cell phones had been found at the scene: phones belonging to Jenkins, Daniels, and Byrd. The State had advised defense counsel that Daniels's phone was locked and she claimed not to remember the combination. Byrd's phone, however, allegedly was not locked and could be accessed. Jenkins asked the trial court to order the State to download the cell phones of both alleged victims and to provide the downloaded data to him in a reasonable time for defense counsel to use the data at trial, which was scheduled for August 19, 2019.

{¶ 13} The trial court held a hearing on the motion to compel on August 9, 2019. The court informed the parties that the hearing was limited to whether the State could access the two cell phones.

{¶ 14} The State called Daniels, who testified that on November 12, 2018, she owned an iPhone 7 with a four-digit passcode. Daniels stated that she had not seen the phone since November 12 and she did not remember the passcode. Daniels indicated that she went to the Prosecutor's Office a couple weeks before the hearing and was

unable to get into her phone. On cross-examination, Daniels stated that she would cooperate if the court ordered her to obtain assistance from Apple to unlock her phone.

{¶ 15} Detective Thomas Cope testified that Byrd's cell phone, an Alcatel flip phone, had been held as evidence since November 12, and he (Cope) attempted to have the phone analyzed a couple of weeks before the hearing. Cope stated that the phone could not be analyzed because it was password protected. Cope testified that he contacted Byrd, who provided several possible passwords; none of those worked. An analyst also tried unsuccessfully to access the phone with the Cellebrite system.

{¶ 16} Immediately following the testimony, the trial court overruled Jenkins's motion to compel. The court explained: "[T]he Defendant still has not advised the Court of any good faith basis that there is exculpatory evidence on these phones. The State made a good faith effort to get into those phones. And I'm going to overrule the motion to compel." The trial court likened defense counsel's request for the cell phone data to a "fishing expedition." The same day, the trial court issued a written entry adopting its oral pronouncement.

{¶ 17} The matter proceeded to a jury trial on September 30, 2019.[1] As stated above, the jury acquitted Jenkins of all counts of felonious assault. The jury found him guilty of having weapons while under disability, and the court imposed a maximum sentence of 36 months in prison.

{¶ 18} Jenkins appeals from his conviction, challenging the denial of his motion to compel and the trial court's imposition of a maximum 36-month sentence.

---

[1] Defense counsel informed the trial court that Jenkins did not want to waive a jury trial on Count Five, having weapons while under disability. Accordingly, all charges were submitted to the jury.

## II. Alleged *Brady* Violation

{¶ 19} In his first assignment of error, Jenkins claims that the trial court erred in denying his motion to compel the State to provide data from Byrd's and Daniels's cell phones, pursuant to *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 20} *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Disciplinary Counsel v. Kellogg-Martin*, 124 Ohio St.3d 415, 2010-Ohio-282, 923 N.E.2d 125, ¶ 24, citing *Brady* at 87. Under *Brady*, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Aldridge*, 120 Ohio App.3d 122, 145, 697 N.E.2d 228 (2d Dist.1997), quoting *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus.

{¶ 21} On this record, any error in the trial court's denial of Jenkins's motion to compel disclosure of data from Byrd's and Daniels's cell phones is now harmless beyond a reasonable doubt.

{¶ 22} Jenkins was convicted only on the charge of having weapons while under disability, in violation of R.C. 2923.132(A)(3). To establish that offense, the State was required to prove that Jenkins knowingly acquired, had, carried, or used any firearm or dangerous ordnance when he had been convicted of "any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." *See* R.C. 2923.13(A)(3). The indictment alleged that Jenkins had previously been convicted of possession of cocaine in *State v. Jenkins*, Montgomery C.P. No. 2008-

CR-3359.

{¶ 23} At trial, the State presented two judgment entries for *State v. Jenkins*, Montgomery C.P. No. 2008-CR-3359, showing a conviction for possession of cocaine, a felony of the fifth degree. Detective Cope testified that he spoke with Jenkins on March 4, 2019, and confirmed Jenkins's name, birth date, and Social Security number. That information matched the identifying information on the judgment entries for the prior case.

{¶ 24} Jenkins testified at trial that he had brought the gun used in the shooting to the apartment with him. He explained that he did so because Daniels lived in a bad neighborhood. He stated that the gun was on the bed while he was getting dressed, but he put it on the ground while he was tying his shoes. When Jenkins fell back toward the closet, the gun was located next to his foot. Jenkins testified that he picked up the gun and began shooting to protect himself.

{¶ 25} Given the evidence at trial, we find no basis to conclude that Daniels's and Byrd's cell phones contained any data that would be relevant to Jenkins's conviction for having weapons while under disability. The documentary evidence of the 2008 conviction and Detective Cope's testimony established that Jenkins could not lawfully possess a gun on November 12, 2018. We find nothing to suggest that Daniel's and Byrd's cell phones would have any information relevant to whether Jenkins was the defendant in Case No. 2008-CR-3359. Jenkins testified that he brought a gun to Daniels's apartment, and he admitted to firing it there. Jenkins has not suggested that the cell phones would have any information relevant to Jenkins's possession and use of a firearm at Daniel's apartment on November 12.

{¶ 26} In short, at this juncture, we find no reasonable probability that the outcome

of the trial on the charge of having weapons while under disability would have been different had the trial court granted the motion to compel. There is nothing to suggest that Daniels's and Byrd's cell phones have any material information as to that charge.

**{¶ 27}** Jenkins's first assignment of error is overruled.

### III. Maximum Sentence

**{¶ 28}** In his second assignment of error, Jenkins claims that the trial court erred in imposing a maximum 36-month sentence.

**{¶ 29}** In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2d Dist. Miami No. 2016-CA-16, 2017-Ohio-4097, ¶ 6.

**{¶ 30}** "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 31} At sentencing, the trial court heard from defense counsel and reviewed the presentence investigation report (PSI); Jenkins declined to make a statement. Defense counsel emphasized that "this is a midlevel felony." Counsel noted that the prior conviction used to establish Jenkins's legal disability was from "11 years ago, a non-violent felony of the fifth degree." Counsel acknowledged that there were "a number of offenses that the PSI writer noted, the vast majority of which [were] misdemeanors." Counsel requested community control for Jenkins. (Counsel also noted that the PSI misspelled the name of Jenkins's hair salon business, which the probation department could not find during an internet search.)

{¶ 32} Prior to imposing sentence, the trial court told Jenkins that it was considering only the offense for which he had been found guilty and was "in no way considering the offenses for which the jury found [him] not guilty." The court then discussed Jenkins's criminal record, stating:

You have a lengthy juvenile record, including an assault, a number of theft offenses, you have -- looks like five misdemeanor offenses, including a conviction for domestic violence in 2017.

As to your felony record, while the conviction for which -- which was -- or the convictions, actually, which were utilized for the disability, I note that you have numerous other felony convictions, including possession of cocaine in 2009, an F5. You were originally granted supervision and eventually revoked for non-compliance. Another case in '09, F4, possession of drugs. You were sentenced in that case. 2010 engaging in a pattern of corrupt activity, F4. You were originally sentenced in that,

granted -- excuse me, transitional control, and revoked from parole and returned to the institution in that case. 2010, a trafficking in drugs, F4. You were sentenced on that.

And I have to give strong consideration, sir, to the fact that you were convicted of possession of drugs in April of 2019 in Hamilton County. All of those offenses prohibit you from at any time carrying a weapon. There is no defense to carrying a weapon under these circumstances. It appears that you again, from your statements, in the pre-sentence investigation -- let me just go back to that. You acknowledged that you knew that it was unlawful for you to carry a weapon, that – I'm going to be honest with you, sir. It appears that what – your lifestyle -- and that's your choice, but you choose to carry a weapon and you're not permitted under any circumstances to do so.

The court stated that, "after considering the purposes and principals of sentencing, and the seriousness and recidivism factors, the Defendant's lengthy felony record, and history of noncompliance," it was imposing 36 months in prison.

{¶ 33} Jenkins was 32 years old at sentencing. The PSI reflects that Jenkins had nine juvenile adjudications between 2003 and 2005 and five misdemeanor adult convictions, the most recent of which was a domestic violence conviction in 2017. Jenkins's felony record consisted of four prior drug cases (two in 2009, one in 2010, and one in 2019), all of which involved fourth- and fifth-degree felonies, and a conviction for engaging in a pattern of corrupt activity (2010). As noted by the trial court, Jenkins was sentenced to prison in three of those felony cases. Jenkins originally received

community control for his 2009 possession of cocaine conviction, but his community control was revoked and he was sentenced to six months in prison on that offense, as well.

{¶ 34} As stated by the trial court, Jenkins acknowledged during the presentence investigation that he was not lawfully permitted to own a firearm. He told the PSI investigator that he possessed the firearm because he had received multiple threats due to the success of his entertainment business in Georgia. Jenkins said that one of his vehicles had been shot at in Atlanta. At trial, Jenkins had testified that he brought the gun to Daniels's apartment because she lived in a bad neighborhood.

{¶ 35} With the record before us, we cannot conclude that the trial court's imposition of a maximum 36-month sentence was clearly and convincingly unsupported by the record. Jenkins's second assignment of error is overruled.

## IV. Conclusion

{¶ 36} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
James S. Sweeney
Hon. Mary Katherine Huffman